# THE STATE v. F. H. DONNINGTON, Appellant.

## Division Two, December 10, 1912.

1. **IMPOTENCY: Carnal Knowledge: Cross-Examination of Defendant: Visit to Woman of Ill Repute: Admission and Circumstance.** In the prosecution, for carnal knowledge of a little girl, of a defendant who has undertaken to prove that he had been wholly impotent for more than a year preceding the time of the alleged offense, it is not error to permit the State to prove by the cross-examination of defendant that he had visited the house of a woman of ill repute within that year, nor to ask him if he had not stated to a certain witness that he had visited her house and was going to "get some from her," and then upon his denial of the statement to prove by the witness that defendant had made the statement; nor was it error to refuse to strike out the testimony, when the question was if he had not made the statement in 1910 and the witness testified it was in 1909. The testimony was competent as a circumstance and an admission tending to discredit defendant's testimony as to his impotency, even though not for the purpose of impeachment.

2. **———: ———: Power of Sexual Intercourse: Expert Testimony.** Where defendant tries to meet the charge of carnal knowledge of a little girl by attempting to show that he had been wholly impotent for more than a year, it is not error to refuse to permit a physician, who states he had paid but little attention to the girl, to state whether or not in his opinion the defendant could have had sexual intercourse with her, since he had not sufficiently qualified himself to answer the question.

3. **CARNAL KNOWLEDGE: Scrutiny of Testimony.** The heinousness of the crime of carnal knowledge with a little orphan girl who has been taken into defendant's household and the strong feeling against one accused of such a crime, independent of the question of guilt or innocence, have such an influence against the accused, that courts, in a spirit of caution born of experience, closely examine and scrutinize the evidence upon which a conviction has been secured.

4. **DEFILING WARD: With Force: Tested as Rape.** In the prosecution of a defendant charged with having defiled a female under eighteen years of age who had been confided to his care, proof of force is not necessary if she is shown to have been under fourteen; but if the only testimony for the State tends to show ravishment by force, the sufficiency of the testimony

to sustain a verdict should be judged by the rules applicable to rape. Any testimony competent in corroboration of the prosecutrix in forceable rape would be competent in such a case, but if there is no corroboration the verdict cannot stand.

5. ——————: Reversal for New Trial: No Corroboration. Where there is an utter absence of testimony corroborative of the prosecutrix in the carnal knowledge case; there are many contradictions in her testimony given at the trial of that given in her deposition; her version of the crime is improbable, and her reputation for truth and morality was seriously impeached, a verdict of guilty cannot stand; but the cause will be remanded in order to afford the State an opportunity to corroborate her.

Appeal from Bates Circuit Court.—*Hon. C. A. Calvird,* Judge.

REVERSED AND REMANDED.

*Silvers & Silvers* and *W. O. Jackson* for appellant.

(1) The testimony of the prosecuting witness was so unreasonable, contradictory and inconsistent that the jury should have been instructed at the close of the State's case or after the introduction of all the testimony to acquit the defendant. State v. Prendible, 165 Mo. 353; State v. Huff, 161 Mo. 487; People v. Lyons, 51 Mich. 215. (2) Dr. Hall had been a physician 38 years, knew the prosecuting witness had not reached the age of puberty, knew her size, also had made a physical examination of defendant in February, 1910, about the time of the alleged offense. He should have been permitted to tell whether or not defendant could have had sexual intercourse with the prosecuting witness. 17 Cyc. 36; Seckinger v. Mfg. Co., 606; Hardman v. Brown, 162 Mass. 585; State v. Cole, 63 Iowa, 695; Lowe v. State, 118 Wis. 641; Allen v. Voje, 114 Wis. 1. (3) Defendant should not have been cross-examined about the visit to Clara Hussy or about his conversation if any with Paul Jenkins concerning Clara Hussy. This was new matter not referred to

in his examination in chief. R. S. 1909, Sec. 5242; State v. McGraw, 74 Mo. 573; State v. Patterson, 88 Mo. 88; State v. Bulla, 89 Mo. 598; State v. Graves, 95 Mo. 513; State v. Hathhorn, 166 Mo. 229; State v. Kyle, 177 Mo. 663; State v. Grant, 144 Mo. 63. (4) The motion to strike out the testimony of Jenkins which referred to the visit of Donnington to Clara Hussy and his conversation about her should have been sustained. It appeared on his cross-examination that the visit, if any, and the conversation, if any, was in the spring of 1908, and not at the time laid in the impeaching question to Donnington in February, 1910. (5) The defendant cannot be impeached, nor can a ground of impeachment be laid by asking him questions relative to matters not inquired into in his examination in chief. This would deprive him of his rights under Sec. 5242, R. S. 1909. State v. Bulla, 89 Mo. 595; State v. Grant, 144 Mo. 56. The testimony was not proper for the purpose of impeachment. Its only tendency was to establish the bad character of defendant by a single act of moral delinquency which is not permissible. State v. Taylor, 98 Mo. 245. When the State desires to impeach a defendant there are three known ways of doing so, viz.: (a) By proof of his general bad reputation. State v. Baker, 209 Mo. 444; State v. Pollard, 174 Mo. 607; State v. Rider, 90 Mo. 54; State v. Beckner, 194 Mo. 281. (b) By proof of other crimes committed by him where he has been convicted tending to effect his credibility as a witness. This can be done in two ways: By the record of the conviction. By asking the defendant on cross-examination whether he has been convicted of other offenses as permitted under Sec. 6383, R. S. 1909, as to ex-convicts. State v. Arnold, 206 Mo. 597. (c) By showing that defendant has made former statements inconsistent with his statements made on the witness stand, but these statements so made by him must be such as he made in his examination in chief

or on his cross-examination properly and lawfully conducted under the limitations of Sec. 5242, R. S. 1909, and the judicial construction placed thereon. State v. Bulla, 89 Mo. 595; State v. Grant, 144 Mo. 63. (6) The verdict was evidently prompted by passion and prejudice and was not the result of a calm consideration of the facts in evidence. State v. Prendible, 165 Mo. 353; State v. Huff, 161 Mo. 487; State v. Primm, 98 Mo. 368; State v. Castor, 93 Mo. 242; State v. Jaeger, 66 Mo. 173; State v. Bugdorf, 53 Mo. 65; State v. Marshall, 47 Mo. 378; State v. Mansfield, 41 Mo. 470; State v. Brosious, 39 Mo. 534; State v. Packwood, 26 Mo. 340.

*Elliott W. Major*, Attorney-General, and *John M. Atkinson*, Assistant Attorney-General, for the State.

(1) The prosecutrix was but a girl 13 years of age at the date of the alleged crime. Her testimony is perfectly consistent, reasonable and is corroborated by a number of facts testified to by appellant's witnesses. Appellant's own wife testified that she was absent from her home on several occasions, leaving the prosecutrix and appellant there. The credibility of the prosecutrix's testimony was a question for the jury. The court submitted this issue to the jury by proper instructions. The jury believed the evidence as given by the prosecutrix, and disbelieved appellant's testimony, denying the commission of the crime. (2) The question asked Dr. Hall had reference to treatment rendered appellant by Dr. Hall on a diagnosis for "general debility" and kidney trouble. It had no reference to any treatment for impotency. Furthermore, the assignment cannot be reviewed, as the record does not contain any statement as to what appellant expected the answer to this question would be. State v. Arnold, 206 Mo. 589. (3) Dr. Hall had made no examination of the prosecutrix. He says he

was only in "speaking distance of her" one time, and that was in the month of September, prior to the date of the alleged crime. The court only sustained the objection to the question calling for the opinion of Dr. Hall for the time being, thereby intimating that by laying the proper foundation, he would permit such question to be answered. The record discloses that the doctor was not treating appellant for impotency at that time, and, in fact, knew nothing about his having such a complaint. This assignment is devoid of any merit, and cannot be reviewed, as the record does not contain any statement as to what appellant expected the answer would be to this question. State v. Arnold, supra. Appellant testified that he was impotent at the time of the alleged offense, and had been since the year 1908. To impeach this testimony, it was competent to cross-examine him as to his visit to one Clara Hussy, a woman of ill-repute. It was also competent to prove what appellant told the witness, Jenkins, concerning his proposed illicit intercourse with said woman. This grew out of the direct examination, although not specifically referred to by the witness, and is clearly within the proper range of cross-examination of the appellant under our statute. State v. Miller, 190 Mo. 461; State v. Avery, 113 Mo. 498; State v. Wertz, 191 Mo. 579; State v. Barrington, 198 Mo. 71; State v. Miller, 156 Mo. 85.

KENNISH, J.—The defendant was tried in the circuit court of Bates county, at the February term, 1911, under an indictment containing two counts. The first count charged him with carnally knowing Esther Cronkhite, a female child under the age of fourteen years, and the second charged him with defiling Esther Cronkhite, a female under eighteen years of age, who had been confided to his care. The jury returned a verdict of not guilty on the first count and a verdict of guilty on the second. Defendant was sentenced to

four years in the penitentiary and appealed to this court.

The evidence for the State tended to show the following facts:

At the time of the alleged offense the defendant was thirty-seven or thirty-eight years of age and weighed over two hundred pounds. He was a hard-working man, had been married three times and had a daughter eighteen years of age. His second wife died in March, 1907, and in May of that year he married her sister, who had been making her home at his house prior to the death of his second wife.

In August, 1909, defendant and his wife went to Kansas City and procured, through the mediation of the Detention Home, three children of one R. T. Cronkhite, a laborer, whose wife was dead. The children were Esther, the prosecutrix, who was twelve years of age on January 2, 1909, Forest, a boy aged ten, and Alice aged two. The arrangement made with the father of the children was that defendant and his wife were to take them and care for them as their own. The children were taken to defendant's home on a farm in Bates county and all three remained there until Christmas, 1909, when the father went to visit them and insisted on taking the youngest back home with him. A few days later he did take the baby to his home in Kansas City, and did not see Esther or Forest again until after the indictment herein was returned.

The testimony of the prosecutrix was to the following effect:

The defendant "took advantage" of her five times during February and March, 1910; once during the first week in February, three times in the latter part of that month, and once on the first day of March. On each of these occasions her brother Forest, the defendant's wife, and Mahan, a farm-hand, employed by defendant, were all away from defendant's home,

leaving defendant and her alone in the house. The first three times defendant's wife had gone to town and the last two times she was visiting a neighbor. When the second offense was committed, which was in the latter part of February, Mahan was in the field plowing corn. The first time defendant "took advantage" of her he called her upstairs, in the daytime, caught her by the hands, laid her on the bed and attempted to ravish her. She screamed, fought and resisted in every way she could and he did not accomplish his purpose. When, about three weeks later, he did succeed in defiling her, and also on three subsequent occasions when he forced her to yield to him, the circumstances were precisely the same as at the time of the first assault; defendant either called or sent her upstairs to the same room, in the daytime, caught her by the hands, laid her on the bed and forcibly ravished her, while she resisted in just the same manner as at the time of the first attempt. In the first attempt there was no penetration whatever, but she bled a few drops. The second time there was penetration, from which she suffered pain, but she did not bleed. Defendant warned her if she told what he had done it would mean sudden death, and she never informed any person of what had happened or complained to any person of the treatment she had received, except her brother Forest. She told him of each offense on the road to school. In each instance that was the first opportunity she had to tell him, although three of the offenses were committed on Saturdays when there was no school and would be none until the following Monday. She remained at defendant's home until she and Forest were taken away by the sheriff on June 13, 1910, which was the day before the grand jury returned the indictment against the defendant, and between March 1 and June 13 defendant made no attempt to violate her person. After the commission of the third offense and before the com-

mission of the last one, defendant's wife went to the town of Adrian and remained from Friday until Sunday, and during that time defendant did not molest her.

On cross-examination she testified that after defendant defiled her he whipped her and her brother for stealing money from the hired man and lying about it and for playing truant from school. She denied that she stole the money, but testified that Forest confessed it and then defendant whipped both of them for stealing and lying and for truancy. In a deposition taken eight months before the trial, she denied that defendant whipped her. She admitted that both she and Forest wanted to get away from defendant's home because of "the mistreatment." In her deposition she testified that both she and the boy wanted to leave defendant's place because his wife beat them, and in that connection the following questions and answers appear in her deposition: "Q. Did you and your brother Forest talk about trying to get away from Mrs. Donnington? A. Yes. Q. Did you both agree that if you could tell about Mr. Donnington this would help you get away? A. Forest told. Q. Did he tell this so you could get away? A. I don't know." She admitted that while living in Kansas City she shot at a man, but her testimony does not disclose the circumstances of the shooting. In the course of her cross-examination, the following occurred: "Now, do you remember an old Swede named Swanson? A. Yes, sir. Q. You used to visit him occasionally? A. I visited his wife. Q. His wife—why he was a widower? A. I did his washing for him; my oldest brother always took the clothes to him." She admitted that in a conversation with defendant's mother soon after he was arrested she was asked why she did not tell the mother about defendant's misconduct when the mother visited his home, and that she answered by saying: "Oh, I forgot it; I didn't think about it."

State v. Donnington.

In her deposition, taken two months after defendant was arrested, she stated that when the first assault took place the defendant told her to lie down upon the bed and she refused to do so; that he threatened to whip her unless she did as he told her, and she then lay down upon the bed. At the trial her testimony was that on that occasion he placed her upon the bed by force. In the deposition she said that when the first assault was made she did not know that there was any blood upon her garments until she went to bed that night. At the trial she testified that the defendant noticed the blood on her garments and made her go downstairs and wash them immediately after the assault took place. Asked to explain this discrepancy in her testimony, she said: "I just got it wrong the other time." In the deposition she testified that she did not know in what month defendant first assaulted her; that he "took advantage" of her five times, but she could not tell when any one assault occurred. At the trial, eight months later, she fixed the time of each offense positively; one during the first week of February, three in the latter part of that month and the last one on the first day of March.

After prosecutrix left the witness stand she was recalled by the State and explained that when she said Mahan was plowing corn in February, she meant he was plowing up corn stalks. Being cross-examined, she admitted that the prosecuting attorney had asked her in the meantime if it was not corn stalks instead of corn that the man was plowing in February. She was then asked on what part of the farm he was plowing and answered, "The south end." Asked if she did not know there were no corn stalks on the south end of the farm at that time, she answered, "He was in the west end."

No evidence whatever was introduced by the State tending to corroborate the prosecuting witness. It does not appear that she became pregnant, or that a

medical examination was ever made ·to ascertain whether or not she had been deflowered. It was not shown by any other witness that she suffered any pain or shock as a result of the alleged repeated outrages, or that she made complaint to any person, although she was attending school during the month of February, 1910. Her brother Forest, to whom she testified she made prompt complaint each time the offense was committed, and who was eleven years old at the time of the trial, was not called as a witness.

The defense was a denial by defendant, and testimony contradicting prosecutrix as to many circumstances in connection with her version of the commission of the different offenses; that prosecutrix was a slender, undeveloped girl, had not reached the age of puberty, and that it would have been impossible for defendant to have defiled her without so injuring her as to cause intense pain and suffering; that defendant had been completely impotent since the month of April, 1908; also that the reputation of prosecutrix for truth and veracity and for morality was bad.

Defendant's wife and Mahan, the hired man, testified that Mrs. Donnington was away from home but twice in February, 1910, and but once in March. One of the times to which they testified she was away from home was in the latter part of February, when she went to Adrian on Friday and remained until Sunday. Prosecutrix testified that defendant was guilty of no improper conduct while his wife was away on that trip. Defendant's wife corroborated him as to his impotency subsequent to April, 1908. He was also corroborated in this respect by Dr. Hall of Adrian and by Dr. Dawson of Kansas City, both of whom testified that an injury of the scrotum received by defendant several years before and an operation that was performed therefor, would tend to render him partially or completely impotent. Mahan testified that neither he nor any other person did any plowing on defendant's farm

during the month of February, 1910.   He further tes-
tified that after defendant whipped prosecutrix and
the boy for lying and stealing, prosecutrix said to the
witness that she would "get even with defendant for
whipping her."   Three witnesses from Kansas City,
who had known prosecutrix when she lived there with
her father, testified to her bad reputation for truth
and veracity and morality.   Two of them, Mrs. Miller
and Mrs. Burch, were engaged in city mission work
for the Dunkard Church in Kansas City, and prose-
cutrix came under their observation in their mission
work.   They based their testimony on what they heard
from people living in the vicinity of her father's home.
The other witness, Mrs. Hagen, lived in the immediate
vicinity of the Cronkhite home in Kansas City.

The defendant called a number of witnesses who
testified to his good reputation, and the State, in re-
buttal, produced several who testified to the contrary
on that issue.

Other material facts will be stated in connection
with the points decided.

I.   The defendant was asked on cross-examination
if, returning from Butler to his home in 1910, he did
not state to Paul Jenkins that he had visited the house
of Clara Hussy, a woman of ill repute, and that he was
going to "get some from her."   He denied making the
statement, and in rebuttal Paul Jenkins was asked by
the prosecuting attorney if the defendant made the
foregoing statement to him, under the circumstances
mentioned.   The witness answered affirmatively, but
fixed the date in 1909.   The defendant moved that the
testimony of Jenkins be stricken out for the reason
that the time fixed by the impeaching witness was a
different date from that named in laying the founda-
tion for impeachment.   The court overruled the mo-
tion, and error is assigned upon such ruling.   The

testimony sought to be stricken out was competent as an admission against the defendant upon the issue of impotency, even though not for the purpose of impeachment, and we think the court properly overruled the defendant's motion.

Neither was it error to prove by cross-examination of defendant that he had visited the house of Clara Hussy. He had testified that he was impotent, and relative to that question it was the right of the State to prove his behavior in that respect by cross-examination. That he visited such a place, in connection with his admission to Jenkins as to his intentions, was proper cross-examination, as a circumstance tending to discredit his testimony as to his impotency at the time of the alleged offense.

II. Doctor Hall, as a witness for the defendant, was asked to state whether in his opinion the defendant could have had sexual intercourse with the prosecuting witness. An objection to this question was sustained by the court, and defendant complains of such ruling as error. The court gave as a reason for the ruling that the Doctor had stated that he had paid but little attention to the girl, and was hardly qualified to answer the question, adding, "unless he further qualifies himself the objection will be sustained." The witness did not further qualify, as suggested by the court, and we think the court correctly sustained the objection.

III. One ground of the motion for a new trial is that the verdict is against the weight of the evidence and is not supported by the evidence. This assignment calls for a consideration of the testimony upon which the verdict of guilty rests. In the discharge of this duty we are not unmindful of the settled rule of appellate procedure that it is the province of the jury to weigh the testimony and to determine the facts.

Nevertheless, when the question of the sufficiency of the testimony is properly presented, an appellate court cannot escape responsibility by shifting it to the jury. The heinousness of the crime charged herein and the strong feeling against one accused of such crime, under the surrounding facts of this case, independent of the question of guilt or innocence, have such an influence against the person on trial, that courts, in a spirit of caution born of experience, closely examine and scrutinize the testimony upon which a conviction has been secured.

The defendant was charged with and put upon his trial for two offenses, namely, rape and defiling a female under his care and protection. While the former, on account of the age of the prosecutrix, did not require proof of force, yet the only testimony for the State upon that issue tended to show a ravishment by force and, therefore, any testimony competent in corroboration of the prosecutrix in forcible rape was competent in this case. Upon this theory alone the State was permitted to introduce evidence tending to prove that the prosecutrix made complaint promptly after the commission of the crime, and although the conviction was not upon the count charging rape, both offenses were submitted to the jury upon the testimony, and we think its sufficiency to sustain the verdict should be judged by the rules applicable in rape cases.

In the recent case of State v. Tevis, 234 Mo. l. c. 284, this court, speaking through Brown, J., announced the law upon the question of corroboration of the prosecutrix in such cases, as follows: "A conviction in cases of either incest or rape may be had upon the uncorroborated evidence of the prosecutrix, but when the evidence of such prosecutrix is of a contradictory nature, or when applied to the admitted facts in the case, her testimony is not convincing, but leaves the mind of the court clouded with doubts, she

must be corroborated, or the judgment cannot be sustained. [State v. Goodale, 210 Mo. 275, l. c. 290; State v. Brown, 209 Mo. 413.]''

The same subject is discussed, and the rules by which courts should be guided are set forth, in Kelley's Crim. Law & Prac., Sec. 541, in the language following: ''The credibility of the witness, and whether her statements be true or not, must be 'left with the jury. If her reputation for chastity and morality be good, and she made complaint at her first opportunity, or shortly after the fact, and the accused fled, any such facts would go to strengthen her testimony. On the other hand, if her reputation for truth, morality or chastity be bad; if her testimony be unsupported; if she concealed the injury for any considerable time; if she might have been heard, and yet made no outcry, these facts would tend to show that her testimony is false or feigned. So, if she voluntarily continue friendly intercourse with the accused after the fact without complaining against him, this would tend to render her story improbable. The State may not only show any marks of violence seen upon her person to corroborate her story, but may prove that she made complaint recently after the alleged offense.''

There is such an utter absence of testimony corroborative of the prosecuting witness, in the record before us; so many contradictory statements in her testimony given at the trial, as compared with that given in her deposition; such improbability in her version of the crime; and her reputation for truth and veracity and for morality was so seriously impeached by women who well knew her and her reputation in Kansas City, while no testimony was offered to sustain it, that we are not willing to let a verdict stand for so grave a crime, upon such unsatisfactory evidence. We shall not dwell upon the weakness of the case against the defendant by going over the testimony in detail. We think it sufficient to say at this

time that the decision of the case has been withheld because of the thorough and most careful examination and re-examination we have made of the testimony. We are not disposed to end the case by reversing the judgment and discharging the defendant, for the reason that upon a retrial the State may be able to introduce testimony in corroboration of the prosecutrix, but we do not hesitate to say that unless a stronger case is made against the defendant upon a second trial, an instruction directing a verdict should be given.

Other errors are assigned, which we have examined and found to be without merit, but in view of the disposition made of the case we do not deem it necessary to discuss them.

The judgment is reversed and the cause remanded.

*Brown, P. J.*, and *Ferriss, J.*, concur.