State v. Goodale.

THE STATE v. MARSHALL S. GOODALE, Appellant.

Division Two, March 17, 1908.

1. **INFORMATION: Rape: Sufficiency.** An information charging that "on August 14th, 1906, at the county of Jackson in this State, the defendant unlawfully, violently and feloniously did make an assault in and upon one Ella Brown and her the said Ella Brown then and there unlawfully, forcibly and against her will feloniously did ravish and carnally know, against the peace and dignity of the State," contains a sufficient charge of rape.

2. ———: **Rape and Incest: Joinder.** It is not error to join in separate counts in the same information, a charge for rape and one for incest, if they both relate to the same transaction.

3. ———: ———: **Election.** Nor is the State required to elect on which count it will go to the jury. It has the right to go to the jury on the different phases of the evidence.

4. ———: ———: ———: **Acquittal.** By failing to find defendant guilty of incest, and by finding him guilty of rape alone, the jury acquitted him of the charge of incest.

5. **RAPE: Sufficiency of Evidence: Character of Crime and Witnesses.** Rape is an accusation easily to be made and hard to be proved and harder to be defended by the accused party, though never so innocent. The charge has often been the result of malice or hidden motives, and courts will refuse to permit convictions to stand because of the utter improbability of the testimony in the light of the conceded circumstances. In such case, the character of the accused and of his accuser is a prime consideration.

6. ———: ———: **Concealment.** Where the alleged rape was in a hotel and there was no outcry, and where the prosecutrix thereafter proceeded on a journey with defendant and visited with him at the house of her aunt for ten days and made no complaint or statement to her, but, continuing to maintain friendly relations with defendant, then proceeded to another city where they visited other of her relatives for ten days longer and then returned to her mother's home in Colorado, where, for the first time, twenty-four hours later she told her mother, who made no complaint for two weeks later but she and prosecutrix continued to maintain friendly social relations with defendant, who was forty-nine years old and a brother of prosecutrix's mother, inviting him to eat in their house and going to a park with him; and where there is no corroboration of prosecutrix's testimony, but on the contrary there is evidence that her previous reputation for chastity and veracity was bad, and his good, the verdict of guilty cannot stand.

Appeal from Jackson Criminal Court.—*Hon. Wm. H. Wallace,* Judge.

REVERSED.

*Moore, Handy & Kimbrell* for appellant.

(1) The court erred in overruling defendant's motion to require the state to elect on which count of the information it would proceed. (2) The court erred in refusing to allow defendant to show specific acts of unchastity of the prosecuting witness. Muller v. St. Louis Hospital, 5 Mo. App. 401; O'Connor v. Railroad, 106 Mo. App. 220; State v. Boyd, 178 Mo. 17. (3)

The court erred in not instructing the jury on all of the law governing this case; the court failed to instruct the jury that it was the duty of the prosecutrix at the time of the alleged assault to make an outcry, and as soon as opportunity offered, to complain of the alleged offense to others. State v. Boyd, 178 Mo. 10; State v. Wertz, 191 Mo. 585.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1)   The court did not err in overruling defendant's motion to require the prosecuting attorney to elect on which count of the information the State would proceed to trial. 1 Bish. New Crim. Proc., sec. 457; Kelley's Crim. Law & Prac., sec. 203; State v. Houx, 109 Mo. 654; State v. Porter, 26 Mo. 201; secs. 2523, 2524, R. S. 1899. (2)   The court did not err in excluding evidence of specific acts of unchastity of the prosecuting witness. Under either count of the information prior acts of unchastity would be no defense, and it is not now an open question in this State that a witness cannot be impeached by proving specific acts of unchastity. State v. Rogers, 108 Mo. 203;   State v. Bobbst, 131 Mo. 328; State v. Sibley, 131 Mo. 519; State v. Grant, 79 Mo. 113. The case of State v. Boyd, 178 Mo. 17, cited by appellant, does not announce a contrary rule. (3)   The weight of the evidence was a question for the jury, not for this court. State v. Alexander, 184 Mo. 266; State v. Dent, 170 Mo. 398; State v. Thornhill, 177 Mo. 691; State v. Franke, 159 Mo. 535. The jurors and the trial court had the advantage of having before them the parties to this transaction and of observing their conduct and demeanor on the witness stand, a fact that is not lightly to be considered in passing upon the question of the credibility of a witness, as numerous decisions of this court   attest. Looking at the facts and circumstances of this case as they appear coldly and impersonally in the record, it

would be difficult, if not impossible, for the writer to reach the conclusion arrived at by the jury and permitted to stand by the trial court, or any conclusion involving the defendant's guilt in his conduct toward the prosecuting witness. But the jury heard all the evidence; it had the parties before it, and acting within its province, under the law, found the defendant guilty.

GANTT, J.—At the January term, 1907, of the criminal court of Jackson county, the prosecuting attorney of said county filed in open court an information in two counts, charging the defendant, respectively, with the crimes of rape and incest. The prosecuting witness, upon and with whom the offenses were charged to have been committed, is Ella Brown, an unmarried female, and at that time between fourteen and fifteen years of age.

The defendant was arraigned, entered a plea of not guilty, and the court, for want of time to try the cause, continued the same until the next regular term. At the April term, 1907, of said court, the defendant filed a motion moving the court to require the prosecuting attorney to elect upon which of the counts he would proceed to trial. This motion was overruled by the court and exceptions saved to such ruling. The same motion was made a second time at the close of all the evidence, and with the same result. The defendant was then put upon his trial, convicted of rape and his punishment assessed by the jury at a term of seven years in the State penitentiary. After filing motions for a new trial and in arrest, which were overruled by the court, and exceptions saved, judgment was pronounced and sentence passed, in accordance with the verdict, from which judgment and sentence the defendant appealed to this court.

At the trial the evidence disclosed substantially the following facts:

At the time of the alleged offense, the prosecuting witness, Ella Brown, was an unmarried female between fourteen and fifteen years of age, and was residing with her mother and sister in Colorado City, in the State of Colorado. Her mother, Comeletta Brown, was a widow and worked by the day to secure a livelihood for herself and two children. Mrs. Catharine Cavanaugh is the mother of the defendant and Comeletta Brown, and was then living with their stepfather, her second husband, in the city of Colorado City, about two blocks distant from the home of her said daughter. The two families were on the most intimate and friendly terms. The defendant, Marshall S. Goodale, is an uncle of the whole blood of the prosecuting witness, and was about forty-nine years of age at the date of the alleged offense. He had been married, but was separated from his wife, and the latter had obtained a divorce from him in the city of St. Louis, where she resided, shortly before the occurrence of the facts upon which this prosecution is based. He was a telegraph operator by trade and had been engaged in that business in different parts of the country since he was fifteen years of age. He had served in the United States Navy, in the Spanish-American war, and afterwards in the land forces as a sergeant of the signal corps in the Philippine Islands. He received his discharge from the army in 1904, and again resumed his trade as telegraph operator in the employment of a railroad company in Oakland, California. About the 28th of July, 1906, the defendant went to Colorado City to visit his mother, sister and their families. During his stay he was on the most friendly and intimate terms with his relatives at that place, at one time having made a trip with the prosecuting witness to the city of Denver, where they remained over night at the hotel, sleeping in separate beds in the same room. No complaint by the prosecutrix or her mother is made

against the defendant for any misconduct or impropriety on this trip. After the defendant had been in Colorado about two weeks he was preparing to leave to make a visit to his sisters and their families at Bolivar, Missouri, and to other relatives and acquaintances in the city of St. Louis. It was suggested that the prosecutrix accompany him on this trip, and it was finally agreed that she should do so. Accordingly, on the 13th of August, 1906, the defendant and the prosecutrix left Colorado for the trip to Missouri. They arrived at Kansas City the evening of the next day after the only daily train from that point to Bolivar had departed, and it became necessary for them to remain in Kansas City over night and until they could take the train the next morning at 10 o'clock for their destination. They took lodging at Hotel Convention. The defendant registered under the name of Marshall S. Goodale and daughter, and they were assigned to a double room containing two beds. After getting their supper, the defendant and the prosecutrix went out upon the street and listened for a time to the Salvation Army, and then retired to their room. The prosecutrix testified, with much minuteness of detail, that after they had returned to their room at the hotel the defendant ravished her. The defendant, on the other hand, testified that after returning to their room they retired and slept until the next morning, and denied that any of the occurrences had taken place during the night, as testified to by the prosecutrix. After breakfast at the hotel, they went to the depot, took their train for Bolivar, at which place they remained, visiting their relatives for a period of from ten days to two weeks. They then went from Bolivar to St. Louis and remained at the latter place about the same length of time visiting relatives, after which they returned together to the home of the prosecutrix in the State of Colorado. During the time intervening between the time they

stopped at Hotel Convention and their return to Colorado, the prosecutrix had made no complaint whatever as to any mistreatment or misconduct toward her on the part of the defendant, but. she and her mother both testified that on the second night after.her return she then communicated to her mother the facts as to the defendant's conduct and crime when they remained over night at the hotel in Kansas City. For about two weeks after their return to Colorado the relations between the defendant and his sister and family, including the prosecutrix, were as friendly and intimate as they had formerly been, the defendant having taken them to church and to the public parks and eating at his sister's home.

There was evidence at the trial that the general reputation of the prosecutrix and her mother for virtue and chastity was not good in the community in which they lived, and defendant testified that he had been apprised of this fact before they made their trip to Missouri, and that he had talked with the prosecutrix on the subject on their return trip. Some weeks after their return the defendant talked with his sister upon this subject, and advised her to have her daughter examined by a physician, that she might know the truth in regard thereto, and he offered to pay the physician's charge for the examination. Up to that time the relations continued friendly between the brother and his sister and her family as before. The mother had the examination made, and the deposition of the physician who made the examination was taken by the defendant and read in evidence at the trial. Depositions were also taken by the defendant of witnesses who testified to specific acts of unchastity of the prosecutrix before her trip to Missouri with the defendant. This testimony, upon objection of the State, was stricken out by the court, to which action of the court the defendant excepted, and now complains on this appeal.

The court submitted the case to the jury upon the first and second counts of the information, and the jury returned a verdict of guilty of rape upon the first count, as heretofore stated.

I. The first count in the information charges that "on August 14th, 1906, at the county of Jackson in this State, the defendant, unlawfully, violently and feloniously did make an assault in and upon one Ella Brown and her the said Ella Brown then and there unlawfully, forcibly and against her will feloniously did ravish and carnally know, against the peace and dignity of the State."

The information contains a sufficient charge of rape.

There was no error in joining the two counts, one for rape, the other for incest, as they both related to the same transaction. [State v. Mallon, 75 Mo. 355; Owens v. State, 35 Tex. Crim. 345; Bishop's New Crim. Proc., sec. 453; Porath v. State, 90 Wis. 527; Wiggins v. State, 84 S. W. 821; State v. Houx, 109 Mo. 654.]

Nor was the State required to elect. It had a right to go to the jury on the different phases of the evidence. The jury acquitted defendant of incest by failing to find him guilty thereof and finding him guilty of rape alone.

II. The all-important question on this appeal is whether the testimony in this case is sufficient to sustain the conviction of the defendant. The admonition of Lord Hale that "it must be remembered that this is an accusation easily to be made and hard to be proved and harder to be defended by the party accused, though never so innocent," must be heeded. While it is the law of this State, as in most others, where not modified by statute, that a conviction for rape may be sustained upon the uncorroborated evi-

dence of the outraged female, it is nevertheless equally well settled that the appellate court will closely scrutinize the testimony upon which the conviction was obtained and if it appears incredible and too unsubstantial to make it the basis of a judgment, will reverse the judgment.

While, on the one hand, it will not do to hold that because the evidence indicates a depravity not ordinarily witnessed among men, it must be rejected, because the annals of crime are replete with examples wherein the most sacred relations have been disregarded and the testimony left no room for a reasonable doubt of the guilt of the accused, yet, on the other, many well-authenticated decisions attest that this charge has often been the result of malice and hidden motives, and the courts have refused to permit convictions to stand because of the utter improbability of the testimony, in the light of the conceded circumstances.

Instinctively the character of the accused and of his accuser is a prime consideration.

In this case, the unchallenged evidence discloses that the defendant at the date of the alleged outrage was a man forty-nine years old. From his boyhood he was a telegraph operator, in different parts of the country. During the Spanish-American war he had served in the United States Navy, and at its close was a sergeant in the signal corps of the land forces in the Philippine Islands.

In 1904 he received an honorable discharge and resumed his profession as a telegraph operator in California. He had been married and was the father of a family, but his wife, who resided in St. Louis, had obtained a divorce from him, on what ground the record is silent.

In the latter part of July, 1906, the defendant came from California to Colorado City, to visit his

mother, Mrs. Cavanaugh, and his sister, Mrs. Brown, the mother of the prosecutrix, and her family. He remained with them until the 13th of August, 1906. During his visit with them the most cordial and friendly relations were maintained. He assisted his sister's family by giving her two daughters articles of dress and in other ways. On one occasion he took the prosecutrix, one of his sister's daughters, to Denver on a trip and remained over one night, the two occupying the same room at a hotel, but with separate beds. There is and was then no suggestion that there was the slightest impropriety in their so doing or that there was the least misconduct on his part toward prosecutrix. Indeed, the record is barren of anything tending to show any undue familiarity on the part of defendant toward prosecutrix at any time before they came to Kansas City on the 14th of August. While at Colorado City defendant made known his intention of coming to Missouri to visit a sister of himself and Mrs. Brown, who resides near Bolivar, in Polk county. The sister of prosecutrix had been permitted to make a visit to Cripple Creek and prosecutrix complained that she was not allowed to to take a trip and defendant said, "You can go with me to visit your aunt in Missouri if your mother is willing," and thereupon her mother willingly agreed. Preparations were made and on the day they left Colorado City, they all met at the home of defendant's mother and started to the train. The mother and two apparently disinterested neighbor women who happened to be present, testified that the mother of prosecutrix enjoined upon defendant to keep prosecutrix with him as she had never been away from home and to take her to his room with him. When they reached Kansas City their train was late and they missed connection with the Bolivar train which left only at 10 a. m. every day. Having to remain in Kansas City over night defendant and prosecutrix went to

the Hotel Convention and he registered in his true name, with prosecutrix as his daughter. That evening after refreshing themselves they took supper together and after supper went for a walk on the street and about nine o'clock returned to the hotel. Up to this time there is practically no conflict in the evidence, but here the two stories diverge and become absolutely irreconcilable. There is no escape from the conclusion that one or the other is utterly false. Prosecutrix testified that after they returned to their room, her uncle, the defendant, started out, saying to her not to undress and retire until he came back, and locked the door. He returned in a short time with a bottle containing wine or some liquid and he poured some into a glass and endeavored to get her to drink some of it, but she refused and he became irritated at her. She stated on the preliminary trial that she knocked it out of his hand but he caught it. On the trial she said this was not true, that she pushed it away and it came near falling. As she would not drink the wine, defendant then proceeded to undress. He stripped himself of every shred of clothing and lay down on his bed. She then lay down with her clothing all on, on the other bed. About thirty minutes later he got up and started to her bed and she got up. He then proposed sexual intercourse with her and she indignantly spurned the proposition. She then says he took hold of her, pulled her to him, sat down on a chair and forced her down on his lap and in this posture had connection with her. She testified in the preliminary trial that she screamed, but she says that was a mistake, she did not scream. He made no other or further attempt to have intercourse with her that night or at any other time. She says he threatened her if she told on him. That he walked the floor and did not go to sleep any more that night.

This story defendant denies *in toto*. He says af-

ter they returned to the hotel, he took prosecutrix to her room and she retired about nine o'clock; that he was suffering with stomach trouble and went out in the city and got him some magnesia and walked around because he could not sleep; that he returned to the room about midnight and she was asleep and he went to sleep; that he never touched her. They both agree that next morning they went to breakfast together, ate breakfast and he paid his bill and they went to the station and took the train for Bolivar. No one at the hotel noticed anything unusual or out of the way with them. They went to the home of defendant's sister, the aunt of prosecutrix, near Bolivar, and remained there about ten days. During the time defendant went fishing and prosecutrix visited with her cousins and went to the neighbors. There was no restraint on her actions. She made no complaint to her aunt, saying she was ashamed to do so. She did not write to her mother of the occurrence at Kansas City. At the conclusion of their visit at Bolivar, defendant and prosecutrix went to St. Louis to visit his other relatives there. She testifies they stopped at a hotel and he was very sick and she sent for a doctor for him. They then visited his divorced wife and he sent his son with her to visit the family of her uncle on her father's side. They remained in St. Louis several days and then took a through train to Colorado City, reaching there on Saturday afternoon. She and her mother both testify she did not tell her mother of the outrage until Sunday night following.

During the two weeks after their return the relations between defendant and the mother of prosecutrix and prosecutrix were as friendly as they had ever been. The defendant upon their invitation accompanied them to church and the evidence is that he also took them to the parks in that vicinity. By their invitation he ate at their house. During all this time,

though according to the testimony of the mother and prosecutrix the mother was fully apprised of the outrage, the mother made no complaint to defendant of his conduct. But it seems from a conversation defendant had with prosecutrix on the trip to Missouri he suspected her of having been guilty of sexual commerce with some man and he told his sister of it and advised that she have an examination to see if his suspicions were well founded. When he told the mother this, even then, she did not charge him with the offense, although she says she had then heard it from prosecutrix, but contented herself with saying, "You must have made an examination, you know so much," and saying she would attend to that. An examination was made by her request by a highly reputable physician of Colorado Springs to see if prosecutrix was pregnant and he found prosecutrix had maintained sexual intercourse with some man but was not pregnant, and gave it as his opinion that the conditions he found were the result of "more than one relation," and testified there was nothing to indicate she had been foully dealt with recently before his said examination. Thereupon this prosecution was begun. A number of residents of Colorado City testified that the general reputation of prosecutrix in that city for truth and veracity and for chastity was bad and that the reputation of her mother for truth was bad. On the other hand, there was testimony that the general reputation of defendant as a moral and law-abiding citizen was good.

In State v. Witten, 100 Mo. 525, Judge BLACK, speaking for this court, said: "A concealment of the injury for any considerable time after the woman has had an opportunity to complain, and a failure on her part to make an outcry, where the act is committed within the probable hearing of other persons, are circumstances which will justify a strong, but not conclusive, inference that the act was with her consent,

and not by force. [1 Whart on Crim. Law (9 Ed.), sec. 565; Roscoe's Crim. Ev. (7 Ed.), 879; 3 Greenl. Ev., 212.] An outcry and resistance are important elements of evidence, and a want of these circumstances, where they may be reasonably expected, goes far to disprove the charge of rape; and a concealment of the injury, where there is an opportunity for early disclosure, may lead to a like inference.'' The rule thus announced has ever been the law of this State.

Applying that statement of the law to this case, it must be conceded that if this crime was committed at all it was in a public hotel, in a room which had three windows in it and with guests in the adjoining room and yet the prosecutrix says herself she made no outcry.

But conceding that his alleged threats excuse her want or outcry, the testimony still shows a concealment of the injury and a failure to complain by prosecutrix after she had an opportunity to do so. Grant, as we think should be done, that, since she was in a strange city and knew no one to whom she could look for protection, her failure to complain would not be significant evidence of no rape, how are we to explain her failure to unburden her heart to her own aunt when she reached her home near Bolivar and remained there for ten days mingling freely with her cousins and the neighbor children? What was more natural, if she had suffered this terrible outrage, than that she should have informed her own aunt, her mother's own sister? Who outside of her mother would have so certainly sympathized with her and offered her every protection against any alleged threats?

But, further, when the visit to her aunt's was about ended and the time came for the defendant to go to St. Louis to visit his relatives there, what must have been the répugnance of prosecutrix, if she had in fact suffered this outrage at the hands of defendant, to

starting alone with him again to another great city where she would be in his power for a repetition of the outrage? How naturally she would have shrunk from such a journey and if up to that time she had concealed her injury, how strong would have been the desire to seek protection from a recurrence of the wrong, and to whom would she so naturally appeal for succor and protection, and yet not a word was said and no protest was made, no hesitancy shown to going away with him alone. Had she then made the complaint surely she would not have been further entrusted by her aunt to one so lost to every instinct of humanity, kinship and decency, if her evidence is to be credited. They went to St. Louis and then home together and no further attempt was made on his part to wrong her. They arrived home and according to her and her mother she did not complain to her mother until the second night after her return. When we consider the conduct of the mother and prosecutrix for nearly two weeks after the mother was apprised of this charge; that they invited him to eat at their table; to go to church with them, and accompanied him to the parks, just as if nothing had ever happened, we can not reconcile it with the ordinary and natural instincts either of a mother or of an outraged, virtuous young woman.

When all these facts are considered with the testimony as to the bad reputation of prosecutrix for chastity and truthfulness, we are of opinion, with the Attorney-General, that "it is difficult, if not impossible, to reach the conclusion arrived at by the jury and permitted to stand by the criminal court or any conclusion involving the defendant's guilt in his conduct toward the prosecuting witness." If we take the tests laid down and everywhere accepted as full of wisdom, the testimony did not measure up to the requirements of the law.

210 Sup—19

State v. Goodale.

Thus it is said: "If she be of good fame—if she presently discover the offense and made search for the offender—if she showed circumstances and signs of the injury, whereof many are of that nature that women only are proper examiners—if the place where the act was done was remote from inhabitants or passengers—*if the party accused fled for it*—these and the like are concurring circumstances which give greater probability to her evidence. But if, on the other hand, the witness be of evil fame and stand unsupported by others—if without being under control or the influence of fear, she concealed the injury for any considerable time after she had opportunity of complaining—if the place where the act is alleged to have been committed was near to persons by whom she might probably be heard and yet she made no outcry—these and the like afford a strong though not conclusive presumption that her testimony is feigned."

We have carefully gone through this record and loth as we are to interfere with a verdict which has met with the approval of the criminal court, we have reached the conclusion that it is not based upon evidence which will stand the tests of law, and no man ought to be incarcerated in the penitentiary upon such an unnatural and unreasonable story, wholly unsupported, as it is, by any fact or circumstance corroborating it.

The judgment is reversed and the cause remanded for a new trial, and unless stronger evidence is adduced, the court should direct an acquittal of the defendant.

*Fox, P. J.,* and *Burgess, J.,* concur with all that is said in this opinion except as to remanding the cause. In their opinion the judgment of the trial court should be reversed and the defendant discharged. It is so ordered.