**STATE of Missouri, Respondent,**

**v.**

**William Lewis NASH, Appellant.**

**No. 44324.**

Supreme Court of Missouri.

Division No. 1.

Nov. 8, 1954.

John M. Dalton, Atty. Gen., Grover C. Huston, Asst. Atty. Gen., for respondent.

J. William Blackford, Kansas City, for appellant.

HOLLINGSWORTH, Judge.

Defendant has appealed from a sentence of imprisonment in the State Penitentiary for a term of seven years imposed upon him in conformity with the verdict of the jury finding him guilty of the crime of incest upon his thirteen-year-old daughter. He contends that: (1) the testimony of said daughter, hereinafter for convenience referred to as prosecutrix, is uncorroborated and unconvincing; and (2) the verdict is (a) against the greater weight of the credible evidence and (b) the result of passion and prejudice. These contentions require a detailed statement of the testimony.

Prosecutrix testified: She lacks one day of being fourteen years of age, lives in Kansas City, attends Northeast Junior High School, has eight brothers and sisters whose ages range from 21 years to 20 months, and now resides with five of them and her mother. She knows the nature of an oath. It is a bad thing, perjury, a criminal offense, to lie. She understands the seriousness of the charge against her father and that it is a penitentiary offense. On January 2, 1953, her mother went to the General Hospital for three days. Her father did not want to sleep with the baby, so she slept with the baby. About 9:30 p. m., her father came into the room, forced her—told her—to take off her pajama bottoms and there had sexual relations with her. She understands what sexual relations are, his privates penetrated hers. All six of the children were at home. This had occurred before. It started when she was about eleven years old. Her father would warn prosecutrix not to tell her mother. "Mother always told the girls that if anything ever happened to them they would have to go to a home * * * and he always told me it would be just as bad for me as it would for him, if I told it." Prosecutrix never told anybody about it until her eleven-year-old sister told the teacher at school. Prose-

cutrix then told her mother. "Q. Before April, when you told your mother about it, before that, did you and your other sister (Carol Jean), did you talk about what was going on? A. Well, she told me that he had been bothering her that once, and I believed her, but I didn't tell her I believed her, because I didn't know what to do about it, and so I just let it go. No, I don't think we ever discussed it together."

On cross-examination prosecutrix testified: There are six rooms in the home, three upstairs, three downstairs. On January 2, 1953, her 21-year-old brother and his wife occupied a kitchenette and bedroom on the second floor. On the second floor is also a large bedroom in which "us four girls sleep". Three of them were in that room that night. The baby slept with prosecutrix in Daddy's (and Mother's) room. A six-year-old brother also slept in the latter room in a small separate bed. The continuing sexual relations between prosecutrix and her father took place "in the bedroom, mostly, or upstairs, when we were working upstairs, on the front porch, or when we would go in—he would bother me when we were out * * * feeding the hogs, or something like that." She has no idea as to the number of times. "Q. Fifty? A. Maybe. I couldn't estimate it."

Prosecutrix also testified that she went to school on January 2nd, and then explained: "Yes, we went to school, because on that— Oh, on January 2nd, no, sir. I am sorry; I was mixed up with April 10th. No, we did not go to school January 2nd."

She further testified: Her father did not touch her from January 2nd to April 10th; her mother was at home all the time. Asked as to being chided by her father about a boy, she answered: "These three boys that I go to school with, and usually a gang of us usually come home together. Well, they was up in the pasture hollering. My mother was sick. I suggested—Daddy says, 'Either call the police or call his parents,' so I says, 'I will call his parents.' It was all right with me. So I called this one boy's parents and told them, and she told me to go out and tell him—they was

in a pasture next to the house—to go out and tell him to go on home. After that night the boy don't speak to me, or nothing. The only reason that was—I didn't have dates with the boys, or nothing—I kind of liked this boy, he come up to the pasture, I went over twice to talk to him, that was all. One time my father told me I could. I went with Carol Jean over and talked to him a little while."

Carol Jean, prosecutrix' sister, testified: She is now twelve years old. She knows what is meant by telling the truth and that she would be punished if she did not. She had sexual intercourse with her father in her mother's bedroom when her mother was in the hospital, once in the morning and then in the afternoon. "He just said that I better hadn't tell Mama on him." She told prosecutrix and afterwards told her school teacher on a Friday. On that day her father kept calling the school when her mother was in the hospital, saying he wanted her to come home, saying that to Miss Thompson. Miss Caldwell, another teacher, then called her mother and told her about it.

Witness at first said her conversation with the teachers took place on April 10th. Then she said it took place on January 2nd as she was dressing for school; that her oldest brother and his wife had left for their work; that she knew it was on January 2nd because her mother was in the hospital and the lawyers, or policemen, had helped to fix the dates. (It seems clear that the witness became confused as to the dates of the two different incidents about which she was testifying, to wit: the incident of her father having sexual intercourse with her and the incident of telling the teachers about it on April 10th.) That morning he started "playing nasty with me"—and that was the day she told the teacher. It (sexual intercourse) happened twice, but witness cannot remember the dates.

Defendant's wife, called as a witness on behalf of defendant, testified: On April 10, 1953, she was called to the school and told by Miss Thompson that Carol Jean was

afraid of her father, that he had molested her. Carol Jean's father had, called the school three to five times that day. When the youngest boy got out from school, he, the father, sent him back over there after her. The teachers would not let her go, because Carol Jean was afraid; Carol Jean sent word to her father that she was sick. The school principal called the Welfare Department. Witness took Carol Jean home. Defendant came down to meet witness and Carol Jean as they walked homeward. "I accused him of what they had told me. He denied it, and I knew the way he denied that he was lying, and so I said, 'You wouldn't expect me to believe your story about this girl'—however, I hadn't known about the second one at the time." Witness made complaint against defendant on Saturday.

The only unusual treatment of prosecutrix and Carol Jean by defendant that witness ever noticed was: "No, not—only when I would ask him to punish the 13-year-old girl, who was in here to testify a while ago, he would let her get away with anything. The others, he would cross them. I have always said, 'Why will you let her go and get away with something, that you wouldn't the others, sassing back, and— why would you let her get away with that?' "

Witness further testified: Defendant goes to the General Hospital for "check-ups". He has not worked much for the last five or six years. His doctor said he had "total disability, with his heart, cardiac patient. * * * He had a sterile operation two months before the baby was born." He and witness made the arrangement for the operation; it was the Welfare Department's idea, not hers. Witness does not "recollect" telling defendant that if he were sent to prison she would get a divorce for a dollar and get the place, but she has sued for divorce. This affair is her main ground for divorce.

On cross examination by the State, witness testified: Defendant drank a lot around the house, every day if he could get it. And further: "Q. After the girls told you what had been going on, did you talk to him about it? A. Yes, but there wasn't much talking to do. Q. What did he say about it? A. Oh, he said he went half way with them, examining them, but he said he didn't actually bother them."

Defendant testified he did none of the things "they have said." He has been married twenty-three years, has not been steadily employed for six years. He has heart trouble and asthma and is continually under treatment. He is not supposed to work but does try to. If he works all day, he has to sit up all night, can't lie down. His wife made all the arrangements for the sterilization operation and she had all of her female organs removed. This has made her "awful nervous". He first heard of these charges on April 10th.

Witness further testified: "Q. Did anybody ever explain to you why they waited from January to April to tell anybody about this thing? A. No, they never explained it. But my wife, along about, I would say, September the 1st (year not stated), her brother came up one evening, oh, I guess around 5 or 5:30, we were out in the barn, and was out there for, I guess, 30 minutes, maybe longer, and my wife, or one of the children, said to come on in to supper, and I came on in to supper. We ate supper, and my wife got through eating and she went in the other room, dressed up, come back, I said, 'Where are you going?' I said—she said, 'I am going to take the night out.' Of course, I opposed it. She started down the road, and I started with her. She had one of the children call the law from Sheffield, so they came out and took me down to Sheffield Station, and she went down and put in a court order, a complaint, or something, and the next morning I was in front of Judge Frost over there, and she told him that she didn't need me out there and didn't want me out there." Defendant was sentenced to sixty days imprisonment in the county jail. (There is no further explanation of this incident.)

"Q. Now when she—Mr. Nash, let me ask you this: You are accused here of having intercourse with one of these daughters

many, many times. Would you tell this jury exactly what your condition is in regard to that respect? A. Well, sir, when I have intercourse with my wife, when we aim to have, she has to help me get ready, and when I do, it takes me 30 minutes to 45 minutes to get over it, because it pretty near knocks me plumb out to have intercourse. Q. How long has that condition existed? A. Ever since I have been sterilized, my gland is as big as my thumb. They sterilized me in eight minutes."

Defendant further testified: He does not drink every day, does not have the money. He did not tell his wife he "went half way" with the children; that is a lie. The charts will show his wife was not in the hospital on January 2nd. He receives $55 per month from the Welfare Department and his wife receives $135 per month.

Following submission of the case, the jury returned into the courtroom where the foreman, in the presence of counsel for both parties, announced to the court: "Your Honor, the jurors all took a vote upstairs—* * *. The question is we don't think we have had or been presented enough evidence, one way or the other, to justify our decision. Now, if it is possible for us to get any more evidence—" To which the court replied: "No, you have everything. You have just got to determine this case on what is the proper evidence as produced." Thereupon, the jury again retired to its room and thereafter returned the aforesaid verdict.

In support of his contention that the verdict is against the greater weight of the evidence, defendant cites State v. Brown, 209 Mo. 413, 107 S.W. 1068; State v. Tevis, 234 Mo. 276, 136 S.W. 339; State v. Goodale, 210 Mo. 275, 109 S.W. 9; State v. Wade, 306 Mo. 457, 268 S.W. 52. We have carefully read each of these cases. The Brown, Tevis and Goodale cases are readily distinguishable on the facts. The Wade case is unfavorable to defendant. It holds that the clear and positive testimony of a fifteen-year-old prosecutrix upon every essential element of the crime of carnal knowledge, though uncorroborated, and though the sexual intercourse occurred in broad daylight in an open field where prosecutrix was running a disc and defendant was plowing, was sufficient to sustain a conviction, and affirmed the judgment.

■ In State v. Ball, Mo.Sup., 133 S.W. 2d 414, 415, this court quoted with approval from State v. Tevis, supra: " 'A conviction in cases of either incest or rape may be had upon the uncorroborated evidence of the prosecutrix, but when the evidence of such prosecutrix is of a contradictory nature, or when applied to the admitted facts in the case her testimony is not convincing but leaves the mind of the court clouded with doubts, she must be corroborated, or the judgment cannot be sustained.' " To the same effect are State v. Lawson, Mo. Sup., 136 S.W.2d 992; State v. Wood, 355 Mo. 1008, 199 S.W.2d 396, 398.

■ This court passes upon the credibility of testimony in criminal cases only insofar as it is necessary to determine whether or not the testimony constitutes evidence sufficient to permit reasonable minds to believe the defendant guilty beyond a reasonable doubt, reserving the power to grant relief only when the denial of it would shock the sense of justice. State v. Dupepe, Mo.Sup., 241 S.W.2d 4, 7. Where the evidence is substantial, the effect of conflicts or inconsistencies or mere improbabilities are questions for the jury in the first instance. State v. Hadley, Mo. Sup., 249 S.W.2d 857, 861. Thereafter, it is the province of the trial court to determine whether the verdict is against the greater weight of the evidence, and its finding in that respect will not be set aside unless an abuse of its discretion clearly appears. State v. Whitman, Mo.Sup., 248 S.W. 937, 938. The Supreme Court will not weigh the evidence where there is substantial evidence to support the finding of the jury and the judgment of the trial court. State v. Emrich, Mo.Sup., 250 S.W. 2d 718, 725.

■ The testimony of prosecutrix is clear and unequivocal that defendant has frequently carnally known her since she

was eleven years of age. Although it appears that she may have been in error in testifying that the particular act of abuse with which defendant was charged occurred on January 2nd, yet there is no uncertainty in her testimony that it occurred during the three days her mother was in the hospital which, she testified, began on that date. The testimony of Carol Jean, although showing confusion as to the times when defendant had mistreated her, definitely corroborates the testimony of prosecutrix, in that it shows a proclivity on the part of defendant to satisfy his lust upon the body of a daughter, as does the testimony of prosecutrix' mother that defendant admitted to her that "he went half way with them, examining them, but didn't actually bother them". Defendant's own testimony tends to show a remarkable tenacity of desire to accomplish sexual gratification, despite his physical impairment.

■ We have not overlooked defendant's argument that the failure of the State to produce medical testimony that the two daughters had been violated, and its failure to produce the school teachers as witnesses to their complaint against defendant rendered the State's case unconvincing and incredible. As to the latter, the teachers were as available to defendant as to the State. Produced by the State, their testimony, while admissible in this type of case, would nevertheless have been hearsay and highly self-serving. Produced by defendant, in contradiction of Carol Jean's testimony, their testimony would have been devastating to the State's case. Neither have we overlooked prosecutrix' testimony that the acts of intercourse occurred in the bedroom, on the front porch, in the feed lot, "or something like that". Defendant says it is unlikely that such occurrences so often and openly performed would not have been discovered by other available witnesses. All of these were matters for the jury. The weight of the evidence was considered on motion for new trial by an able and experienced judge, who saw and heard the witnesses.

■ Defendant contends that in assessing the maximum punishment against defendant the jury demonstrated it was governed by passion and prejudice rather than the weight of the evidence; that "since the jury stated that a vote had been taken and not enough evidence produced, then the verdict had to be based upon passion and prejudice, because the jury had been instructed that if there was not enough evidence to convict, they should acquit."

Of course, a jury is reluctant to convict any man of incest upon his daughter until every possible avenue of information has been explored. But the jury had been instructed to acquit defendant if it had a reasonable doubt of his guilt. We must presume it heeded the admonition given it. It seems clear that upon further consideration of the evidence, the jury determined that the State's testimony was true and assessed a punishment which it considered mete and proper. We are not prepared to say that, assuming the long continued criminal conduct of defendant as shown by the State's evidence, the verdict indicates passion or prejudice in assessing the maximum penalty. Section 563.220 RSMo 1949, V.A.M.S.; State v. Hagerman, Mo.Sup., 244 S.W.2d 49, 55; State v. McHarness, Mo.Sup., 255 S.W.2d 826, 829.

The judgment is affirmed.

All concur.