**STATE of Missouri, Plaintiff-Respondent,**

v.

**James A. SARTEN, Defendant-Appellant.**

No. 48177.

Supreme Court of Missouri,

Division No. 1.

Feb. 13, 1961.

Motion for Rehearing or to Transfer
to Court en Banc Denied
March 13, 1961.

Neale, Newman, Bradshaw, Freeman &
Neale, Jean Paul Bradshaw, O. J. Taylor,
Springfield, for appellant.

John M. Dalton, Atty. Gen., George E.
Schaaf, Sp. Asst. Atty. Gen., for respondent.

HOUSER, Commissioner.

A Laclede County jury found James A.
Sarten guilty of stealing 26 head of cattle

and fixed his punishment at imprisonment in the county jail for 60 days and a fine of $1,000. Defendant has appealed from the judgment of conviction, seeking an outright reversal of the judgment on the ground that the evidence against defendant was not sufficiently substantial to warrant submission of the case to the jury, and in the alternative a reversal and remand for a new trial for the following alleged procedural errors: Improper and prejudicial cross-examination of the defendant and of the defense witness Boelio; abuse of discretion in permitting certain witnesses to testify in rebuttal, and error in the giving of an alibi instruction.

At the time the cattle were stolen, July 20, 1958, defendant was a second lieutenant in the United States Army, the executive officer second in command of the replacement company at Fort Leonard Wood, Missouri.

The State's theory is that defendant stole the cattle through an innocent agent; that defendant, acting under an assumed name and representing that he owned cattle which in truth and fact belonged to Jewell and Claude Groves, employed a commercial truck operator named Powers to go to the pasture where the cattle were located, load and haul them to market, sell them and cause the proceeds to be deposited in a St. Louis bank in the name assumed by defendant, thereby intending to convert the cattle to his own use and deprive the owners of their use. The State's evidence, briefly stated in chronological order, tended to show the following: After soliciting but failing to secure the help of two enlisted men in his company to "help load some cattle" defendant, whose automobile was not in working condition, asked a third man in his company, one Pvt. Lalumondiere, who owned an automobile, to drive him to Richland, Missouri on business. Lalumondiere agreed to do so and on July 17, 1958, drove defendant to Richland, where defendant visited at the home of the trucker Powers. Defendant introduced himself as "Mr. Anderson," represented that his name

was Edward P. Anderson, stated that he had cattle to ship to East St. Louis stockyards, and made the arrangements above described, including the deposit in the bank to the credit of Edward P. Anderson of the net proceeds of the sale of the cattle.

The defense consisted of a denial and an alibi. Defendant denied that he had any such conversations, dealings or contacts with the enlisted men Deroshia, Moseley and Lalumondiere, or Powers, denied that he arranged for or had any connection with the stealing, and presented testimony accounting for his presence elsewhere at all times and places mentioned in the State's evidence.

Appellant's first point is that the testimony of the State's witnesses is not substantial; that the testimony of Sgt. Moseley is contrary to common sense and the common experience of mankind, false and completely impeached as "pure, unadulterated perjury"; that the testimony of the Lalumondieres is inconceivable, incredible, reflects inconsistencies, contradictions and proved perjuries as a result of which it has no weight, and was fully impeached; that the testimony of Lalumondiere is deliberately, wilfully, and maliciously false, and that the testimony of Powers is inconsistent with previous statements he made out of court, tailored to fit facts later ascertained by him, and is impeached and contradicted by obvious physical facts and unimpeached scientific facts. Citing State v. Gregory, 339 Mo. 133, 96 S.W.2d 47, loc. cit. 51; State v. Huff, 161 Mo. 459, 61 S. W. 900, loc. cit. 908; State v. Prendible, 165 Mo. 329, 65 S.W. 559, loc. cit. 566; State v. Francis, 199 Mo. 671, 98 S.W. 11, and State v. Liston, 315 Mo. 1305, 292 S.W. 45, appellant contends that the basic testimony upon which the State relies is so conclusively impeached that it is no testimony at all; that this Court should not permit a conviction based upon conclusively impeached testimony to stand, and should reverse the conviction and discharge defendant.

■ Appellant, conceding that the Supreme Court will not weigh the evidence or substitute its judgment for that of the jury, asks us to review the evidence to determine whether there was substantial evidence of the defendant's guilt sufficient to sustain the verdict of conviction. In so determining, this court passes upon the credibility of testimony only insofar as is necessary to determine whether the evidence is sufficient to permit reasonable minds to find and believe defendant guilty beyond a reasonable doubt, reserving the power to grant relief only when the denial of relief would shock the sense of justice. State v. Nash, Mo.Sup., 272 S.W.2d 179, loc. cit. 183.

■ State's witness Louis Deroshia, a private in defendant's company, testified that about June 20, 1958 defendant asked him if he wanted to help him with the loading of 35 head of cattle located within 35 miles of the Fort, stating that he had the transportation "lined up." Deroshia declined to help defendant.

State's witness Arthur Moseley, a sergeant in defendant's company, testified that on July 16 or 17, 1958 he left the post after signing the sign-out roster, and went to Tic Toc Tavern, a public house nearby. While he was there with Sgt. Schmidt, a friend, he encountered defendant, with whom he had become acquainted about July 1. Defendant introduced himself to Sgt. Schmidt as George Anderson, and produced a forged and false identification card, which he exhibited to Moseley in the presence of Schmidt. Moseley looked at and examined the ID card, saw that it contained a picture of defendant, a serial number, the name "George Anderson," and an authorizing signature. Defendant told both men that he went by the name of George Anderson when outside the post. Defendant then asked Moseley in the presence of Schmidt if he would "like to make a hundred dollars; that he needed a couple of good men to help him load some cattle," about 50 miles from the camp; that he

was supposed to get some trucks to move them, and that it would "have to be a weekend." Moseley testified that he declined, and later that night drove defendant back to the post.

State's witness George Lalumondiere, a private in defendant's company, testified that on the day before July 17, 1958 defendant, whom he had known for two weeks but with whom he had never conversed, asked Lalumondiere to drive him in Lalumondiere's automobile to Richland, where he had some business to take care of, stating that his own car was not in operating condition and that he would pay for the gasoline. Lalumondiere agreed and on July 17 he drove defendant to Richland, accompanied by Mrs. Lalumondiere. They picked up defendant at the Fort at 5 p. m. Defendant suggested that they go to the main PX and have a coke, which they did. They had another coke, at defendant's suggestion, when they reached the town of St. Roberts. The trip was made in Lalumondiere's 1957 Ford which Lalumondiere described at the trial as a two-tone gray, dark on the bottom, light-colored in the middle. They arrived in Richland at 6:30 p. m. and went to a house in the driveway of which there was a truck bearing the name "Powers" on its side. The Lalumondieres remained seated in the car. Defendant entered the house through the front door, remained inside about 15 minutes, and left by the front door, saying that his business was taken care of and that he was ready to return to the Fort. Mrs. Lalumondiere corroborated her husband's testimony. Both Lalumondiere and his wife positively identified defendant as the person whom they transported to Powers' home at Richland.

State's witness Raymond Powers testified that his wife had taken a phone call relating to the shipment of some cattle, and that on July 17, 1958 at about 6 or 6:30 p. m. a man whom he positively identified at the trial as the defendant came to his home in Richland in a 1955, '56 or '57 Ford, introducing himself as "Mr. Anderson."

He said he paid no attention to the color of the Ford; that it was a two-tone paint job. Powers described the person who came to his home as a young fellow about five feet seven to eight inches tall, "light-complected," light hair, weighing about 160–165 pounds, dressed in light clothing. This description corresponds with the height, weight, complexion and color of hair of defendant. Powers sat within two feet of the man for 25–30 minutes during which arrangements were made to pick up, load, transport and sell the cattle, and deposit the funds in the St. Louis bank, as heretofore described. "Anderson" indicated that he had cattle on a 160-acre tract three miles east of Nebo, which he wanted to sell. He told Powers how to get to the pasture, and wanted him to load and transport the cattle to East St. Louis; that if "Anderson" was not there when they arrived with the trucks to go ahead and load the cattle, sell them at an East St. Louis commission house and deposit the proceeds at Boatmen's National Bank in St. Louis to the credit of Edward P. Anderson. He said this man took a pencil and printed the following on a piece of paper:

"Pine Creek Grocery
100 yds
Ed Anderson
Deposit to
Edward P. Anderson
Boatmans Nat Bank"

and that on Sunday morning, July 20, 1958, Powers went past Pine Creek Grocery to the designated pasture, loaded the cattle in two trucks with the help of his son and one Carl Johnson, and sent them on to East St. Louis. The theft was discovered that day, and the trucks were intercepted on the way to St. Louis. Two sergeants from the Missouri State Highway Patrol came to Richland to investigate and interview Powers. Powers' statement to the patrol officers, embodied in a written report dated July 23, 1958, indicated that Powers had said that the

man who contacted him used the name *George* P. Anderson. The officers' recollection at the trial was that Powers had used the word "George" instead of "Edward" in reporting the facts to them. The written highway patrol report indicated that Powers had described "Anderson" as follows: age 22, height 5 feet 9 inches, weight 180, and having a dark tan, and the automobile in which Anderson arrived as follows: "White/light brown, 53–55 Ford, Fort Leonard Wood sticker." Powers insisted at the trial, however, that he gave the sergeants the same information as to the man's first name, height, weight, complexion and car description, that he swore to at the trial. On July 25 or 26, 1958 Powers was taken to the Fort and into the presence of defendant, whom he identified as the man who came to his home. He testified that he said "Hello, Mr. Anderson," whereupon defendant "reared back like" and "turned pale." On that same trip he saw an automobile which "they told" him belonged to Lalumondiere, and it was the same automobile that drove up to his house on July 17. On cross-examination Powers stated that the note written by defendant at his house was all written at one time and at one sitting with the same pencil. A handwriting expert testified that part of the note was written with a soft lead pencil and part with a hard lead pencil, on different surfaces, and that there was a difference between the writing of the first three lines and the second three lines. He further testified that he had obtained specimens of defendant's printing and compared them with the note produced by Powers purporting to be defendant's printing; that there were distinct differences; that in his opinion the same person did not write the two notes and that the note produced by Powers was not printed by defendant. In a deposition Powers, asked about identifying marks, said that as defendant went out the door (the *back* door) he noticed that defendant had some kind of a scar or spot on the back of his head, about as big as a nickel, which had some white in

it. Defendant had no such white spot on the back of his head at the trial. This mark of identification was not referred to in Powers' direct examination. On cross-examination Powers adhered to the story and insisted that the man with whom he made the deal had a light spot on the back of his head. Defendant exhibited his head to the view of the jury. It had no such white or light spot or patch and no scar was visible. Defendant produced a beauty college operator who testified that there was no white spot on the back of his head and that his hair had not been dyed, and three doctors, one a pathologist, who testified that they had examined defendant's head and had examined microscopically hairs pulled from his head and from other parts of his body. Their professional opinion was that there were no scars or light spots then, or in 1958; that defendant's hair had not been dyed, and that his scalp and hair were normal in every respect. On rebuttal the State, over objection, was permitted to introduce the testimony of two women, a newspaper reporter and the wife of the sheriff, that they saw defendant at the jail during the month of July, 1958 and that he had a white spot, a light spot, on the back of his head at that time.

Mrs. Raymond Powers testified that a person who said he was "George" Anderson called by telephone to discuss the hauling of cattle, and that she was present when a man arrived and had a talk with her husband with reference to the matter. She did not, however, identify defendant as that man. She looked at the back of the head of the man who talked to her husband at her home but she *did not notice any scars or marks*. She also testified that a "George" Anderson called on July 21, 1958 at about 7 a. m. The caller said that he was in St. Louis and asked for her husband. She did not identify the voice on either of these calls as that of defendant.

The testimony of the three enlisted men is not substantial evidence sufficient to support the finding of any fact necessary to a verdict of guilt. The testimony of Deroshia, apparently introduced as circumstantial evidence of the fact that defendant had formed an intent to steal the cattle in question, is equivocal. It is admitted by all that defendant lived off the post, near Nebo, Missouri, some 35 to 40 miles distant, where he raised cattle on a rented farm. His testimony would be as referable to his own cattle as to Groves' cattle, as consistent with the innocence of the defendant as with his guilt. The testimony of Moseley that this defendant, a responsible officer in the U. S. Army, while in a public tavern, introduced himself under an assumed name to an enlisted man who until then had been a complete stranger, exhibited a forged ID card (the possession of which is a federal offense) to the stranger and to a sergeant in his command whom he barely knew, offering a sizeable sum of money for a menial task in an operation which, if the State's theory is correct, involved the theft of a large number of valuable cattle, stretches credulity to the breaking point and is so contrary to human experience and so intrinsically improbable as to constitute no evidence at all. The tavern episode apparently was relied on to establish that defendant used Anderson as an assumed name and had a forged ID card by which he could identify himself, from which the jury might infer that he intended to use the ID card to identify himself as "Anderson" at the bank and thereby be enabled to withdraw the proceeds of the sale there deposited. There is, however, a frustration in the evidence. The deposit was to be in the name of *Edward* P. Anderson, but the ID card supposedly was in the name of *George* Anderson. How James A. Sarten intended to withdraw funds deposited in the name of Edward P. Anderson by the use of an ID card in the name of George Anderson is not explained. Finally, Moseley's testimony is so thoroughly impeached by documentary evidence that it stands for nothing. Moseley testified positively, nine

different times in this transcript, that he signed the sign-out roster the night of the tavern episode. The roster, produced in court, completely impeached Moseley's nine-times-repeated statement, and conclusively demonstrated that Moseley had perjured himself when he testified that he signed out that night. The captain of the replacement company testified that every enlisted man in his organization was required to "sign out" when leaving the post and "sign in" upon returning and that leaving without signing out would constitute a soldier absent without leave. Moseley was not reported AWOL. If Moseley did not leave the post that night the meeting at Tic Toc did not occur. Appellant has properly characterized the testimony of Moseley as "contrary to physical facts, in conflict with common observations and the experience of mankind, in conflict with unimpeached records of the U. S. Army, inherently impossible, incredible and untrue, and therefore not substantial evidence upon which to base the conviction of this defendant."

The sign-out roster also revealed that State's witness, George S. Lalumondiere, swore falsely under oath. Lalumondiere and his wife lived off the post. Lalumondiere testified that personnel who live off the post ordinarily do not sign the sign-out roster; that he did not sign out on July 17, 1958; that he was never told to sign the roster; that he never signed out; that he would leave without signing out and that he had done that as long as he had been there (more than a year). In direct contradiction, the sign-out roster showed that on numerous occasions Lalumondiere had signed out when leaving the post. He *had signed out* on July 13, 16 and later on July 21. He *did* know that he was required to sign out, for he had signed out frequently. The roster unquestionably revealed that Lalumondiere swore falsely with respect to signing out. The fact that he did not sign out on July 17 and that he was not reported AWOL renders suspect his story that he took defendant to Rich-

land that date. If somehow he was able to pass through the gate without signing the roster, his story nevertheless is further impeached by previous inconsistent statements. He acknowledged that he had changed his original statement as to time of arrival at Richland to conform to the testimony of other witnesses. When first questioned he told investigating officers that the time of arrival at Richland was 7:30 p. m. At the trial he changed this to 6 or 6:30 p. m. for the asserted reason that the sun was still up when they arrived and that he knew the sun would have been down at 7:30. On direct examination he claimed to have made the change on his own accord but on cross-examination it was developed that Lalumondiere had a meeting with the deputy sheriff and prosecuting attorney, at which the latter pointed out that his testimony as to time did not "jibe" with that of Powers, and that it was after that meeting that Lalumondiere decided to change his testimony to make it correspond. Lalumondiere conceded that when he was first questioned he "might have told" the investigating officer (nine days after the stealing) that the man he took to Powers' home had *dark* hair, a "little thin on top." (Defendant has a heavy set of light hair, not yet beginning to thin.) When army investigating officers first talked to Lalumondiere, and before the deputy sheriff and prosecuting attorney interviewed him, Lalumondiere described the man he took to Powers' home as about 5 feet 8 inches tall and "on the heavy side." This description does not fit defendant. Nor does his testimony comport with common experience, i. e., that this officer approached him, a private in his company whom he had known for only two weeks, and in the very first conversation they ever held, asked Lalumondiere to drive him to a distant point on a mission which, if the State's theory be true, was criminal in purpose. Lalumondiere's testimony is perjurious, inconsistent, and inherently improbable. Neither Lalumondiere's testimony nor that of his wife, which was

impeached by prior inconsistent statements as to time, constitutes substantial evidence upon which a conviction may be permitted to stand.

■ Rejecting the testimony of Deroshia, Moseley and the Lalumondieres as so bizarre, improbable and perjurious as to be insubstantial, the inquiry is reduced to the question whether the testimony of Raymond Powers is substantial and sufficient to form the basis of a jury finding of guilt. We cannot brand Powers' testimony as so self-destructive, incredible and inconsistent as to amount to no testimony at all. It could be believed by honest and conscientious jurors. It constitutes substantial evidence. If believed, it unquestionably would be sufficient to permit reasonable minds to find and believe that defendant was guilty beyond a reasonable doubt of stealing by agent. If Powers told the truth he conducted a conversation with defendant, within two feet of him, over a period of 25–30 minutes. He had every opportunity to see and observe defendant and his actions, conduct and demeanor. His identification of defendant at the Fort during the investigation, although not a selection out of a line-up, was immediate and positive. His identification of defendant at the trial was positive and unequivocal. If the investigating officers of the highway patrol were telling the truth, Powers gave them a description on July 20 which does not fit defendant, but Powers insisted that on July 20 he gave the officers the same description he gave at the trial. Whether Powers described defendant or someone else on July 20 was a question for the jury, whose province it is to assess, judge and determine the weight and value to be given conflicting and contradictory testimony. This Court will not usurp that function or interfere with the jury's finding where supported by substantial evidence. The cross-examination of Powers with reference to his description of the Ford automobile revealed weaknesses, but the validity of Powers' identification of the automobile

was also a jury question. Nor is the testimony of Powers impeached and contradicted by obvious physical facts (that there was no scar and no white spot visible on the back of defendant's head at the time of the trial) and unimpeached scientific facts (the hairdresser's and physicians' testimony that the hair of the defendant had not been dyed). The fact, if it be a fact, that defendant had such a distinguishing feature on July 17, 1958 and that he had no such mark and no dyed spot on the back of his head at trial time does not necessarily exonerate defendant or inevitably destroy Powers' identification of defendant. That a light spot visible on July 17, 1958 may have been caused or created intentionally or accidentally by artificial means, and that it disappeared by clipping the natural growth of the hair during the thirteen-month interval between that date and trial time, is a possibility. The opinion of the experts that the hair on the back of defendant's head was normal and that it had not been dyed is not a scientific fact of such an absolute nature that the jury was obliged to accept it without question, but was for the jury to believe or disbelieve, accordingly as the jury credited or discredited the expert witnesses. Powers' positive identification of defendant as the man who arranged with him to purloin the cattle is not destroyed by the foregoing, and must be ruled substantial. State v. Dupepe, Mo. Sup., 241 S.W.2d 4; State v. Preston, Mo.Sup., 184 S.W.2d 1015; State v. Davis, Mo.Sup., 161 S.W.2d 973; State v. Kaner, 338 Mo. 972, 93 S.W.2d 671.

■ Appellant's second point, that the prosecuting attorneys prejudiced the rights of defendant by improper cross-examination of defendant, and by an improper comment made in the hearing of the jury, must be sustained. Pages 543 to 557 of the transcript contain the record of thirteen prejudicial and improper questions asked of the defendant by the prosecuting attorneys, all of which related to matters outside and beyond the scope of defend-

ant's direct examination. For instance, why his ID card was taken away from him; what kind of dogs he had; whether they treed squirrels and whether he was hunting in the woods with his dogs near the Pine Creek Baptist .Church on the morning after the theft; whether he had a friend at Richland named Lieut. Joe Payne; how long he had been married, and whether he was still living at Nebo with his wife; whether he had ever marketed any cattle "before"; whether he would go out and have beer with Lieut. Boelio; and how many times and where they would go; whether he was saying that what Raymond Powers testified to was untrue. Ten of the objections to these inquiries were sustained by the court. The remaining three questions were abandoned by the prosecuting attorney when objection was made and before the court ruled thereon. The prosecuting attorney then asked defendant if he had heard Powers testify that defendant was at his home at Richland, Missouri. Defendant's counsel said: "Just a minute; just a minute," whereupon the former prosecuting attorney who was assisting the State said: "If the Court please, we have got the right to put on some testimony from this witness." Counsel for defendant promptly moved for a mistrial on the ground that counsel's statement was highly prejudicial, coming as it did after the Court had been consistently sustaining defendant's objections to the prosecuting attorney going outside the direct examination. The court sustained defendant's objection to counsel's statement and directed the jury to disregard it but overruled defendant's motion to discharge the jury and declare a mistrial. Although nothing in the record indicates that the assisting prosecuting attorney's statement was intentionally made for the purpose of engendering prejudice, that was the inevitable result under the circumstances. It cast defendant's counsel and there-fore defendant in the role of attempting to exclude and prevent the introduction of material and proper testimony which the State had a right to elicit from defendant. Coming as it did after the series of improper, embarrassing, and provocative questions advisedly and calculatingly directed at defendant, it was bound to and we hold did prejudice the rights of defendant. The rulings of the trial judge were insufficient, under these aggravated circumstances, to remove the poison which had been injected. Prosecuting officials must observe the rules. To intentionally ask defendant questions outside the scope of the direct examination calculated to disparage defendant and arouse prejudice deserves censure. Prosecuting officials should take notice that convictions procured in part by such tactics will not be upheld. To put defendant's counsel to the necessity of making constant objections to such questions is damaging to the defense, and wholly improper. To then characterize proper objections to improper procedure as an attempt to cut off the State's right to elicit proper testimony constitutes reversible error.

The other procedural points raised need not be ruled. The prosecuting attorney may take whatever action he may deem appropriate to avoid the possibility of error in those respects in the event the case is retried.

The judgment of conviction is reversed and the cause remanded for a new trial.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.