**Edmund B. CORLEY, (Plaintiff) Respondent,**

v.

**Eugene R. ANDREWS, Sr., and Helen H. Andrews, (Defendants) Appellants.**

No. 30629.

St. Louis Court of Appeals.

Missouri.

Sept. 19, 1961.

Motion for Rehearing or for Transfer to Supreme Court Denied Oct. 17, 1961.

Dearing, Richeson & Weier and H. L. C. Weier, Hillsboro, for appellants.

E. L. McClintock, Jr., and Charles W. Medley, Flat River, for respondent.

ANDERSON, Presiding Judge.

This is an action by Edmund B. Corley, as plaintiff, against Eugene R. Andrews, Sr., and Helen H. Andrews to recover damages for personal injuries alleged to have been sustained by plaintiff on January 21, 1959, as a result of a fall on an icy sidewalk on premises owned by defendants. There was a verdict and judgment for plaintiff for $10,000. Defendants have appealed.

Defendants own and operate a motel near Desloge, Missouri. In connection with this motel they also own and operate a restaurant, which is located on the front part of the premises. On the night of January 20, 1959, plaintiff stayed as a guest at defendants' motel. On the morning of January 21, 1959, plaintiff arose about five o'clock, and at about six o'clock went to the restaurant for breakfast. Before he left his cabin he looked out of its window and observed that it was not raining. As a consequence he did not wear his top coat, when he left to go to the restaurant. When he started from the front door of his cabin he observed puddles of water in the area in front of his cabin, which he circled and entered the restaurant through the front door. The restaurant faced west. · It is also a fair inference from the testimony that he noticed some ice in front of his cabin, as he emerged therefrom. Plaintiff left the restaurant about 6:30 or 6:45 A.M. He left by the same door through which he had entered. He turned to his right and proceeded along a sidewalk in front of the restaurant, and when he reached the corner of the restaurant he again turned to his right. As he turned the corner, while still on the sidewalk, he slipped on some ice and fell. As he fell he threw up his arms and landed on his back. There was water where he fell. He hit his hand on a post adjacent to the sidewalk. He stated there was no ice on the sidewalk in front of the building. After he had fallen plaintiff went to his cabin, and while there, looked at his wrist and knew then that something was wrong with it. He then returned to the cafe and asked a waitress for a cup of coffee. Later he picked up his grip and went to his car. He observed there was slush on the lid of the trunk of the car. He

stated he did not remember the condition of the weather the evening before he fell. He stated that on the evening of the 20th he ate his dinner, went to his room, read the paper, and went to bed possibly about 7:30 P.M. He did not go outside and make an inspection of the weather at that time, and did not actually know what happened during the night.

After the accident plaintiff drove his car to Bonne Terre, a distance of about 4 miles. He was not able to use his left hand during this trip, but had no difficulty driving on the highway.

Plaintiff read in evidence portions of the deposition of Eugene R. Andrews, Jr. He was defendants' son and was in charge of and managed defendants' restaurant and tourist court on January 21, 1959. He testified there were general icing conditions there that day and "maybe just a little snow"; also quite a bit of freezing rain. He stated he inspected the sidewalk in question the evening before, during which time and after, ice fell and a general icy condition prevailed. He further testified he did not attempt to keep the ice from forming or to remove it while it was forming. He said he probably made this inspection at 10:30 or 11:00 P.M. It was raining and freezing then and the sidewalk was slick.

Mrs. Ova Pratt was called as a witness by plaintiff. She lived at Cantwell, Missouri, and was, on January 21, 1959, employed at the Andrews' Cafe. She testified she went to work that morning at twenty minutes to six. She further testified that she did not remember if it was snowing or sleeting that morning when she left home, but stated there was a general icy condition all over the area.

Ancell Boyer was station attendant at the Andrews' Service Station, and testified for defendants. He got to the station about five minutes after five o'clock the morning of January 21, 1959. He testified that when he arrived there was "fine sleet or a mist

or something like that" falling which continued up to about ten or eleven o'clock. Immediately after his arrival he put salt on the sidewalk. There was a thin sheet of ice and a little snow on the sidewalk. He testified "it was just enough snow you could tell it was a snow, * * * maybe a half inch, quarter of an inch." He stated he put salt on the entire sidewalk. He did not clean off the ice with a shovel, but did sweep it off with a broom after the ice had melted. He could not tell when he did this, but stated it might have been ten or fifteen minutes after he put down the salt.

James P. Collins, manager of Radio Station K.F.M.O. in Flat River testified for the defendants. He stated that the records of his station showed there was freezing rain on January 20, and sleet and freezing rain on January 21, 1959. However, he did not know when the rain started to freeze on January 21, 1959.

Sgt. H. H. Barr, a highway patrolman, testifying for defendants, stated he investigated two highway accidents during the afternoon and evening on January 21, 1959, which were caused by slick road conditions. He stated he did not know what the weather conditions were at 7 o'clock that morning. W. R. Petrus, a highway patrolman, testified there were general icing conditions in St. Francois County on January 20, 1959.

He stated it was freezing and there was some ice on the highway. He believed it was sleeting early in the morning with some snow. He drove to St. Louis that day and came back to Flat River that evening, around midnight. At that time it was raining according to his testimony. He did not recall what the conditions were on January 21, 1959. James L. Englehart, a highway patrolman, also testified for defendants. He lived about a mile from the Andrews Cafe, and went to St. Louis with Petrus. He stated that on the morning of January 20, 1959, there was a general icing condition, and that when he and Petrus left St. Louis about 10:00 P.M. it was raining and that it rained continuously until they got

home around midnight. He stated there was no ice on the highway at the time but there was some snow on the ground the next morning. He did not know the amount of this snow. He stated the snow must have fallen between midnight and 8:00 o'clock the next morning, the exact time he did not know. Mrs. Garnetta Hahn, who lived at Rivermines, testifying for defendants, stated she drove her car in Rivermines on January 20, 1959, shortly before 8:00 A.M. and ran into the curb. She stated that the roadway where this happened was slick. She stated the weather was bad the next day, January 21, 1959; that there was snow and ice on the ground, and it looked like it had sleeted; that she could not take her daughter to work that day; that it was raining and was misty, and foggy; that the road was bad; and that it was in that condition when they got up that morning about six o'clock. Eugene R. Andrews, Jr., defendants' witness, testified that there was a general icy condition with freezing rain on January 20th and 21st; that the sidewalk in question had been cleaned when he saw it at 8:00 o'clock the morning of January 21, 1959; that he knew there was ice on the sidewalk the night of January 20th between 10:30 and 11:00 and that it was slick; that he knew the restaurant was going to open at 6:00 o'clock in the morning and that people would be walking on the sidewalk at that time.

Defendants' Exhibit 3, being a publication of the United States Department of Commerce, containing climatological data for the State of Missouri, showed there was, at Farmington Airport, which is approximately nine miles from Andrews Cafe, 1.65 inches of precipitation on January 20, 1959 and .62 of an inch on January 21, 1959; that on January 20, 1959, the maximum temperature was 36 degrees and the minimum temperature 26 degrees; that on January 21, 1959, the maximum temperature was 34 degrees, and the minimum temperature 3 degrees and that on January 21st, there was an inch of snowfall.

Appellants contend that the court erred in refusing their motions for a directed verdict at the close of plaintiff's case, and at the close of all the evidence. In support of this contention it is urged there was no negligence shown for the reason that the plaintiff's evidence shows that the ice upon which plaintiff fell was the result of a general weather condition which prevailed at the time.

■ A landowner is not the insurer of the safety of his premises, but where he invites the public to use said premises, he must exercise ordinary care to keep the premises in a reasonably safe condition. Whether defendants violated this duty in the instant case depends upon the evidence viewed in the light most favorable to plaintiff.

■ It appears from the evidence that on January 20th there was a general icing condition in the area of defendants' premises. At 10:00 or 11:00 o'clock that night defendants' manager, Eugene R. Andrews, Jr., inspected this sidewalk in question and discovered that it was slick with ice. The next morning defendants' employee, Ancell Boyer, arrived at the service station about five minutes after five o'clock and found there was a thin sheet of ice and a small amount of snow on the sidewalk. The foregoing evidence shows that defendants had constructive knowledge of the dangerous condition of the sidewalk. Immediately after Boyer's arrival at the service station he put salt on the entire sidewalk, and after the ice had melted proceeded to clear the sidewalk of ice by sweeping it with a broom. There was evidence from which a jury could reasonably find that the storm was not then in progress. Shortly after Boyer attempted to clean off the sidewalk plaintiff, an invitee on the premises, emerged from the front door of the restaurant. The sidewalk at that point was free of ice and snow. Plaintiff turned to his right and walked along the sidewalk to the corner of the building. He encountered no

ice or snow as he did this. He then turned the corner and stepped on a patch of ice, slipped and fell. It is a fair inference from the evidence that Boyer had failed to remove this patch of ice earlier when he attempted to clean the sidewalk, and that this slick ice was concealed from plaintiff's view by a thin layer of snow. From the foregoing evidence it is our judgment that a jury could reasonably find that defendants had breached their duty to use ordinary care to keep the premises in a reasonably safe condition, which resulted in plaintiff's injuries. Evans v. Sears Roebuck & Co., Mo.App., 104 S.W.2d 1035.

It is next urged that the court erred in allowing Dr. Robert Potashnick to answer a hypothetical question which defendants claim included facts not in evidence. This necessitates a brief review of the medical testimony. After plaintiff's fall he experienced severe pain in his left hand and wrist. He was taken to the Bonne Terre hospital where he was treated by Dr. Van W. Taylor. X-rays were taken and it was found he had suffered a fractured wrist. A cast was applied and on the following day he returned to his home in Illinois. About the 10th or 11th of February the cast was removed by Dr. Taylor. About ten days after the cast was removed, plaintiff experienced pain in his left arm, and upon looking at his hand noticed that his thumb had collapsed and was laying in the palm of his hand. He thereupon called a chiropractor. He made several visits to the chiropractor and was finally advised to see a medical doctor. He then consulted Dr. Taylor, who in turn referred him to Dr. Charles A. Stone of St. Louis.

Dr. Stone, an orthopedic surgeon, testified he first saw plaintiff on March 13, 1959. At that time plaintiff was complaining of pain in his left thumb and wrist. He had a swelling around the right wrist and was unable to extend his thumb. The doctor diagnosed the trouble to be a severed tendon and plaintiff was sent to DePaul Hospital. He entered the hospital on March 13 and an operation was performed on the 16th of March, 1959. The operation involved an incision in the dorsum of the wrist for the purpose of exploring and finding the ends of the tendon and joining them together. The doctor testified he found the end of the tendon attached to the thumb, but was unable to find the other end of the tendon attached to the muscle. He thereupon decided that the only thing to do was to attach this tendon to another tendon which moved the wrist. After the operation, plaintiff had about the same strength in closing his thumb but had difficulty in extending this member. He also had difficulty in making a fist.

Plaintiff returned to his home on March 20, 1959. On March 21, 1959, he suffered a heart attack which was diagnosed as a myocardial infarction at the Belleville Memorial Hospital to which he was admitted that same day. Dr. Robert Potashnick, who was a heart specialist, testified he examined plaintiff on February 25, 1960. From that examination and from what Mr. Corley had related to him in regard to his previous medical history, together with the records of the DePaul and Belleville Memorial Hospitals, he was of the opinion that plaintiff had suffered an acute myocardial infarction.

The hypothetical question of which defendants complain was put to Dr. Potashnick in an attempt to connect the heart attack with the operation. It detailed the facts in evidence with reference to plaintiff's fall and injury; the loss of use of the thumb and the operation to repair the extensor tendon; it then recited:

"It was noted that Mr. Corley had poor color, and this was during the course of the operation, and it was necessary to place a rubber tube into his trachea, and the operation then continued, and the tendon was repaired. Mr. Corley was released from the DePaul Hospital on March 20, and on March 21, 1959, the following day, at about 1:00 P.M. Mr. Corley felt a very severe pain near his heart. He had

some difficulty in breathing, and he had no previous record of any heart difficulty, and he was admitted to the Belleville Hospital and underwent the treatment and tests that are shown in Plaintiff's Exhibit Number 1. Could you state with reasonable medical certainty as to whether or not this heart attack was in any way connected with Mr. Corley's operation at the DePaul Hospital, which we have described?" (Emphasis ours.)

Counsel for defendants objected to the question on the ground that it included facts which were not in evidence, stating, "I'm referring particularly to this 'poor color'. I can't find any notation at all in these hospital records anywhere where it says anything about any change in color."

Records of the DePaul Hospital which had been previously introduced in evidence did not contain the notation in question. However, the testimony of the doctor was being read from a deposition previously taken, and, it appears from the transcript, that in answer to the objection, plaintiff's counsel told the court that later in his testimony the witness stated he had examined the hospital record and that it did contain such notation. Upon this assurance the court overruled the objection. The Doctor in answer to the question stated:

"I feel that the operation under general anesthesia and with the note made ·by the anesthetist that poor color was present during the time of the operation, and in a man 45 years of age, that this is evidence which would certainly mean that this operation was a precipitating factor in this man's acute myocardial infarction."

Counsel for defendants again objected for the reason previously given and moved that the jury be instructed to disregard the answer and that it be stricken from the record. The objection was overruled and the request denied. The doctor's testimony continues as follows:

"* * * A. During any operative procedure, and with an anesthetic, a person can suffer an inadequate amount of oxygen in the body, and when this occurs in the heart muscle it can result in damage to the heart and can precipitate a myocardial infarction.

"Q. Do you feel that during the operation Mr. Corley did receive an inadequate amount of oxygen? A. The fact that a note was made about the poor color is evidence there was inadequate oxygen * * *.

"Q. You have examined the DePaul Hospital records? A. Yes.

"Q. And such notes are present on —A. On the back of the operative and anesthetic sheet."

On cross-examination the following testimony appears:

"Q. Doctor, you are basing your opinion, which you expressed a while ago regarding the connection of this heart trouble to the operation, that he had, primarily on the records at the DePaul Hospital that he was somewhat pale during the course of the operation. Is that correct? A. It said the color was poor. It didn't describe what the color was, but the back of the sheet stated the patient's color was poor and an endotracheal tube was inserted to continue general anesthetisia."

It will be seen from the foregoing that Dr. Potashnick, testified he had examined the DePaul Hospital Record and that it did contain a notation that poor color was present during the operation. There was no objection to this evidence on the ground that it was hearsay. It therefore, must be considered and given its natural probative effect as if it were in law admissible. Thorn v. Cross, Mo.App., 201 S.W.2d 492; McFarland v. George, Mo. App., 316 S.W.2d 662. We regard the evidence as substantial evidence in the case,

and that it was proper for Dr. Potashnick to consider it in connection with his expert testimony given in answer to the hypothetical question. In our judgment the trial court did not under the circumstances err in allowing Dr. Potashnick's answer to the hypothetical question to be read to the jury.

It is next urged that the court erred in permitting Dr. Potashnick to testify concerning what plaintiff had told him, not about presently existing complaints, but about matters that transpired prior to the doctor's examination.

Dr. Potashnick did not treat the plaintiff but examined him four days before trial apparently to qualify as an expert witness for the plaintiff. From an examination of his testimony as it appears in the transcript the main purpose in calling him as a witness was to prove that plaintiff's heart attack was the result of the operation that was performed on plaintiff's wrist. The doctor testified that he made a complete physical examination, a chest x-ray, electrocardiogram, a urinalysis and took a history from the plaintiff. He also reviewed the records of the Memorial Hospital in Belleville. When asked what history he obtained from plaintiff, counsel for defendants objected on the ground that the question called for hearsay testimony. This objection was overruled. The doctor then testified:

"He related that he had entered De-Paul Hospital on March 15, 1959, that he was operated on the next day, or March 16, 1959, for an injury of the lower part of the left forearm and wrist and thumb, and that he was discharged from DePaul Hospital, March 20, 1959, and the next day, or March 21, 1959, at about 1:00 P.M. he was suddenly seized with severe pain, and he was hospitalized for what he termed a heart attack. He described the symptoms at some length."

The doctor was asked to describe the symptoms which plaintiff related. There was an objection to this on the ground that the question called for hearsay testimony. This was overruled, and the doctor replied:

"He was suddenly seized with severe anterior chest pain, and the pain was unrelenting. He was taken to Memorial Hospital in Belleville, where he was given an injection of medication to relieve the pain, and only then was it relieved."

The doctor then detailed the findings of his physical examination of plaintiff, and concluded his answer by saying, "Now, from the past history and from the records that I reviewed from Memorial Hospital in Belleville, this man had an acute myocardial infarction." Defendants' counsel objected to the last part of the answer on the ground that it related "hearsay as to what something else showed." As to this, it should be said that the records of the Memorial Hospital in Belleville were offered in evidence and show that the final diagnosis there made was "acute myocardial infarction." At the conclusion of the doctor's direct examination, counsel for defendants moved to strike from the record all of the doctor's testimony concerning myocardial infarction for the reason that he based his opinion upon facts which were not in the record or in the hospital records and on hearsay. This motion was overruled.

■ The fact that Dr. Potashnick was permitted to testify as to what plaintiff told him concerning events which transpired prior to the doctor's examination, and to prior complaints and symptoms cannot be said to have been prejudicial. The evidence was cumulative merely. Plaintiff had previously testified to the same things. Furthermore the testimony was offered to prove that plaintiff had suffered a myocardial infarction, a fact over which there was no real dispute. The sharp issue in the case was not whether plaintiff had suffered such disability, but whether or not the heart condition was caused by the operation. We find no reversible error in the

court's ruling with reference to this testimony. Heiter v. Terminal R. Ass'n of St. Louis, Mo.App., 275 S.W.2d 612; Oglesby v. St. Louis Public Service Co., Mo.App., 338 S.W.2d 357; Huffman v. Terminal Railroad Ass'n of St. Louis, Mo., 281 S.W. 2d 863; Oesterle v. Kroger Grocery & Baking Co., 346 Mo. 321, 141 S.W.2d 780; Baumhoer v. McLaughlin, Mo.App., 205 S.W.2d 274; Lesch v. Terminal R. R. Ass'n of St. Louis, Mo., 258 S.W.2d 686; Fellhauer v. Quincy, O. & K. C. R. Co., 191 Mo.App. 137, 177 S.W. 795; Adolph v. Brown, 213 Mo.App. 406, 255 S.W. 947; Gains v. Schneider, Mo.App., 323 S.W.2d 401.

■ The next assignment of error again relates to the testimony of Dr. Potashnick. As heretofore stated the doctor in answer to a hypothetical question gave it as his opinion that the operation was a precipitating factor in causing plaintiff's heart condition. Defendants now contend that it was error to admit this testimony for the reason that it appears that the doctor's testimony was based on hearsay. We have examined the transcript and find no such objection was made when the question was asked the witness, or at the trial when this testimony was read to the jury. We rule the point against defendants.

Appellants' next assignment of error is that "the Court erred in failing to sustain defendants' objection to the use of a piece of cardboard and pencil and in appealing to the jury to follow a mathematical formula in admeasuring damages outside the evidence and instructions of the court."

Plaintiff's counsel in his argument to the jury on the issue of damages, stated:

"Now, what is Mr. Corley entitled to recover? The Court has stated here in Instruction No. 2, exactly what those items are. First: For the pain and suffering that he's suffered to date. The pain and suffering of going through the original fall. The pain and suffering of his operation. The pain and suffering of his heart attack. What's he entitled to? I do not know and no one else knows for certain, ladies and gentlemen. But, I just suggest these figures. You pick out whatever figures you want but I would like to tell you what we feel Mr. Corley is entitled to. First, the pain and suffering to date; we feel that he's entitled to at least $1,000.00 for all of the pain and suffering he's gone through up until today, $1,000.00, and we believe that that would be a reasonable amount."

At this point plaintiff's counsel apparently produced a large cardboard, upon which he listed the amounts mentioned. Whereupon defendants' counsel made the following objection:

"If the Court please, * * * I would like to object to any demonstration made here by counsel as to what he's entitled to and putting it on a piece of paper here. I have no objection to him commenting on the evidence and telling them what he thinks Mr. Corley is entitled to, but to make a demonstration like this on a piece of cardboard that is not in evidence I think is highly prejudicial."

This objection was overruled.

Plaintiff then suggested to the jury that for future pain and suffering plaintiff was entitled to another $1,000; that he was 55 years old with a life expectancy of 21.02 or 7,665 days; that he did not think 50 cents a day was too much for the permanent disability to plaintiff's thumb, which would amount to $3,830; that he thought plaintiff was entitled to 50 cents a day or $3,830 for inability to use his wrist; that he thought $2 a day would not be too much for his bad heart and inability to do a full day's work which would amount to $15,330; and that he felt that for his medical bill plaintiff was entitled to recover $2,000. The figures mentioned were written on the cardboard and added. The total of the items amounted to approximately $26,000.

■ It will be observed that the only objection made at the time was to the use of a cardboard in connection with the argument. No objection at any time was made to the argument urging the use of a mathematical formula in connection with some of the items of damages. Under this state of the record the only thing before us is whether the trial court erred in permitting the use of the cardboard at the time.

The total amount which plaintiff's counsel asked the jury to award his client was $26,000. However, the jury did not find for plaintiff in this amount, but brought in a verdict for $10,000. There is no claim here that the verdict is excessive. Under the circumstances we hold there was no prejudicial error committed by the trial court in permitting the use of the cardboard. Goldstein v. Fendelman, Mo., 336 S.W.2d 661.

■ Another ruling of the Court claimed to be erroneous was the overruling of an objection to the testimony of Dr. Stone with regard to the contents of a certain medical text book. Dr. Stone had testified that the severance of a tendon as a result of a Colles fracture was unusual. He stated that he had never seen one during the fifty-two years of his practice. He then, over the objection of defendants' counsel, testified that in Bonnell's text Book on Surgery of the Hand, a recognized authority, seventy-two such cases were said to have been found. The objection interposed was that the evidence was hearsay. The same objection is urged here.

The evidence was, in fact, hearsay, McDonald v. Metropolitan Street Railway Co., 219 Mo. 468, 118 S.W. 78, but its admission did not constitute reversible error. This for the following reason.

Prior to the admission of this testimony, and during the cross-examination of plaintiff's witness, Dr. Van W. Taylor, defendants' counsel interrogated the witness along the same line. That testimony, as it appears in the transcript, is as follows:

"Q. Actually, it's a very unusual situation, anyway, isn't it, Dr.? A. It is to me. It's the only one I've ever seen occur after a fracture.

"Q. It's not even reported too often in medical journals? A. I've never even read about it in medical journals, No.

"Q. It's most unusual to have any tendon like that severed as a result of a blow to the wrist or the forearm, isn't that correct? I say it would be very unusual for a tendon to be severed by a blow to the forearm or wrist, especially when you don't have any rupture of the skin or outer tissues there enclosing the wrist? A. Uh, yes, it's very unusual, I am sure of it."

It will be seen from the above that defendants brought out the same character of testimony as that offered subsequently by plaintiff, to which defendants object and claim to be inadmissible. Defendants opened up the subject and are not now in a position to complain of the testimony offered by plaintiff. The doctrine of curative admissibility is applicable to the situation. Plaintiffs should be allowed to show that medical literature had reported such cases. Wigmore on Evidence, 3rd Edition, Vol. 1, § 15, Page 304; Biener v. St. Louis Public Service Co., Mo.App., 160 S.W.2d 780; Jones v. Werthan Bag Co., Mo., 254 S.W. 4; Rainier v. Quincy, O. & K. C. R. Co., Mo., 271 S.W. 500; Long v. F. W. Woolworth & Co., 232 Mo.App. 417, 109 S.W.2d 85; Marts v. Powell, 176 Mo.App. 124, 161 S.W. 871; and Enyeart v. Peterson, 184 Mo.App. 519, 170 S.W. 458.

■ Finally defendants complain of Instruction No. 1 given at the request of plaintiff. In the first paragraph of said Instruction the jury was advised that if it found defendants were the owners and operators of the property, and maintained the sidewalk for the use of customers then it became their duty to exercise ordinary care to keep their premises, including the

sidewalk in a reasonably safe condition for use by said customers. By the second paragraph the jury was told that if they found that the sidewalk was partially covered with slick ice, upon which plaintiff fell, and that defendants, by and through their agents and servants, knew of the presence of said ice in time to have removed same or to have spread some kind of cover over the ice to prevent it from being slick, and that in failing to do so defendants failed to exercise ordinary care to keep their premises in a reasonably safe condition, then defendants were negligent and the verdict of the jury should be for the plaintiff if it was further found that plaintiff fell and was injured as a direct and proximate result of such negligence.

Defendants' complaint against this Instruction is that (1) it was error to fail to include in the abstract statement of the law in paragraph one a qualification that if the dangerous condition of the premises was caused by a natural accumulation of ice due to weather conditions which prevailed generally, defendants could not be charged with negligence, and (2) that it was error to fail to hypothesize such facts in paragraph 2 as would authorize a verdict for defendants on the theory that plaintiff's fall was in fact due to ice accumulated as a result of general weather condition prevailing throughout the community.

Defendants' theory of non-liability by reason of general weather condition, though not specially pleaded, was submitted to the jury by Instruction number 4, given at the request of the defendants. There was evidence to support the instruction, some of it coming from plaintiff's witnesses. There was also evidence from which a jury could find that the accumulation of ice on the sidewalk, though a result of general weather conditions, had been present for a sufficient length of time for the defendants in the exercise of ordinary care to have completely removed same from the sidewalk. This latter theory was submitted to the jury by Instruction Number 5. When the instructions are read together we believe

the jury was properly instructed, and that defendants' theory of defense was sufficiently covered. The point is ruled against appellant.

Finding no reversible error in the record, the judgment is affirmed.

RUDDY and WOLFE, JJ., concur.