**Maureen CONLON, a Minor, by Mary Ann Conlon, Her Next Friend, Respondent,**

**v.**

**Mae ROEDER, Appellant.**

**No. 52330.**

Supreme Court of Missouri, Division No. 1.

Sept. 11, 1967.

**154**

Padberg & Raack, Godfrey P. Padberg, St. Louis, for respondent.

Derrick & Holderle, St. Louis, for appellant.

HIGGINS, Commissioner.

Maureen Conlon, age 6, was injured August 16, 1962, in a collision between a 1959 Chevrolet operated by her great aunt, Mae Roeder, and a tractor-trailer unit owned and operated by Atlas Electric Company. Trial March 14–16, 1966, resulted in a directed verdict for Atlas Electric Company and verdict and judgment for plaintiff for $16,000 damages against Mae Roeder.

At the time of collision Mrs. Roeder was taking her grandnieces, Maureen and Jean Conlon, to their home after visiting her over the weekend. Jean was in the front seat; Maureen was in the rear. Mrs. Roeder was northbound on Halls Ferry Road in St. Louis County, Missouri, intending to turn left into Highway 140. The Atlas tractor-trailer unit was eastbound on 140 approaching the intersection from Mrs. Roeder's left. There was a stop sign controlling traffic on Halls Ferry Road crossing or entering Highway 140. Mrs. Roeder, driving about 40 miles per hour, did not remember stopping for the stop sign or looking to her left as she approached before entering 140, and she never saw the truck prior to the collision. The tractor-trailer struck the Chevrolet at the rear door on the driver's side, causing the Chevrolet to spin around and come to rest at the northwest corner of the intersection with its rear upon the curb.

The Atlas driver died prior to trial. Plaintiff was 10 years old at trial and she could not remember anything about the accident except sitting in a chair in a filling station at the scene.

Mrs. Roeder testified that Maureen was thrown from the car to the pavement when the car spun around. When the car came to a stop she went to Maureen and picked her up. She was "covered by blood." Plaintiff's mother first saw her sitting in the filling station.

Plaintiff, accompanied by her mother and defendant, was taken by ambulance to St. Louis County Hospital. Its record, among other things, stated:

"History As below. ? unconscious
"P.E. Lac ⓛ malas area--deep extending into ⓛ nasal
 cavity 1½" Lac. ⓛ eyelid
"Diagnosis " " " "
"Treatment Transferred to Barnes Hosp. Dr. M. Fryer."

———◆———

At Barnes emergency room Dr. Minot P. Fryer, a specialist in plastic surgery, closed plaintiff's wounds. The mother counted approximately 50 stitches in the cheek laceration and the same number in the eyelid laceration. Dr. Fryer later removed the stitches and saw plaintiff some five times following the accident at six-month intervals. He described the cheek injury at trial as a transverse laceration of the left cheek extending into the ala or corner of the nose. It measured 2½" in length by ⅛" in width. The scar was deep and extended down into the fat of plaintiff's face. The eyelid scar measured 10 millimeters by one millimeter and was visible when the eyelid was closed. Dr. Fryer felt that the cheek scar could be improved by a revision ,which would require cutting and removing the deepest scar and approximating the edges together for a finer scar. This surgery would require four or five days' hospitalization. Both scars are permanent. The larger scar is redder than surrounding skin and is more noticeable with summer tanning. The discoloration probably will persist and revision will not change the length of the scar.

On July 23, 1963, while at home standing next to her mother, plaintiff had an experience in which "she started sliding down the wall to the floor * * *. She was not just perfectly, calmly lying there. She was trembling or twitching. She was making motions, but not for any length of time. * * * her hands were not relaxed, and her legs didn't seem relaxed. * * * And she was very white and stayed white for some time, and then complained of a headache * * *. She acted tired and drowsy." A neighbor, Jean Backowski, witnessed this incident. According to her, Maureen stood by her mother and "said something about I don't feel too good, or something, and all the color drained out of her, her eyes drained back in her head, and she started twitching or something and went out. * * * More or less her whole body" was twitching and her eyes "went back in her head. * * * when we got to her on the floor, you know, she was still sort of unconscious."

In February, 1964, Peter T. Conlon, Jr., plaintiff's father, heard Jean Conlon scream that Maureen had fainted, "and I ran into the bathroom. My daughter, Maureen was lying between—her head was between the commode and the bottom of the washstand, and her head was hitting on the floor. * * * Bouncing up and down on the floor. * * * I reached right up in the medicine chest for smelling salts, and tried to revive her. After she started coming around, I picked her up and carried her into our bedroom. * * * She said she was hot, she had a headache, and she was sweating. * * * she said she would like to go to sleep."

Maureen had never fainted prior to the accident, and had been an "easy-going" happy child. Following the accident she went to first grade and did well, but in the second grade she changed, complained of dizziness, stayed home from school, and became difficult. Prior to the accident she enjoyed swimming; after the accident she became afraid of water.

Dr. David Mendelson, a neurologist, saw plaintiff February 25, 1964, upon referral

by plaintiff's pediatrician, Dr. Ebel. Dr. Mendelson obtained history and complaints from plaintiff's mother, examined plaintiff, and ordered X rays and an electroencephalogram. The tracing "demonstrated a mild, abnormal, slow EEG which I thought, in view of her clinical history, may relate to the convulsive basis for the child's complaints." A second EEG tracing made September 17, 1965, was normal.

Dr. Mendelson testified that convulsive disorders can be caused by trauma and that it is not unusual to have a period of eleven months (from August 16, 1962, to July 23, 1963) between the trauma and initial faint. In response to hypothetical questions, he gave an opinion based upon a reasonable degree of medical certainty that plaintiff "had some type of convulsive disorder directly related to the injury experienced" in the collision of August 1962. On cross-examination he stated this conclusion to be based on "reasonable probability." "The prognosis is guarded. She is complaint free as of her last visit, but she still has this tendency to have seizures." On cross-examination Dr. Mendelson also stated that in addition to the hypothesis given, he was aware that plaintiff had been in an accident in which she was thrown from a car and received injuries to her head. He also considered a history of being unconscious following the accident and concluded from that also that plaintiff had received a blow to her head. He stated that one is not rendered unconscious from a blow other than to the head. He wrote in his report that in his opinion plaintiff had experienced a cerebral concussion, which term described the effects on the brain of a blow to the head.

Dr. Fryer "didn't make a note of it at the time, but I do know she was examined for head injury" while in emergency at Barnes Hospital. He testified that plaintiff "could have a severe brain injury, and it might not be anything visible," and Dr. Mendelson stated that "one can receive a fatal blow to the head without any external evidence."

At the conclusion of Dr. Mendelson's testimony, defendant moved to strike the testimony and, at the conclusion of all the evidence, requested Instruction A, refused by the court, which would have withdrawn any issue of brain damage from the jury. Appellant contends (Point II) that the court erred in refusing her motion to strike because Dr. Mendelson failed "to connect the fainting spells or convulsive seizures with any injury the plaintiff sustained," and (Point I) that the court erred in refusing Instruction A because Dr. Mendelson "failed to connect the brain damage with any injury sustained by the plaintiff on August 16, 1962, and his opinion as to brain damage was based on the fact that plaintiff sustained a blow to the top of the head followed by a period of unconsciousness, which facts are not supported by the evidence."

Appellant's argument is that the hypothetical question giving rise to Dr. Mendelson's opinion that plaintiff sustained brain damage as a result of the accident submitted only the facts of two fainting spells or seizures; that he admitted considering other factors such as the accident, and that the plaintiff had sustained a blow to the top of the head accompanied by a period of unconsciousness; that if there had been no blow to the head or unconsciousness, his opinion would have been different; and that there was no credible evidence of the blow or unconsciousness. Appellant cautions that an "expert's opinion must not be a mere guess or conjecture but must be based upon facts and adequate data, and the opinion must (be) * * * supported by competent evidence," Harp v. Illinois Central Railroad Co., Mo., 370 S.W.2d 387, 391[2]; that the facts upon which such an opinion is based must measure up to legal requirements of substantiality and probative force and cannot be based on unproven assumption. Craddock v. Greenberg Mercantile, Mo., 297 S.W.2d 541, 548[11, 12]; Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844, 849[11]; that "where the opinion (of a physician) is based partly on the

facts in evidence and partly on facts related by the patient to the doctor which are not in evidence, * * * the opinion is not competent," Oesterle v. Kroger Grocery & Baking Co., 346 Mo. 321, 141 S.W.2d 780, 782[7] ; that it is error to base a hypothetical question on statements not proved and evidence different from the record or which the evidence does not tend to prove, Bunch v. Wagner, Mo.App., 275 S.W.2d 753, 757 [6] ; Sneed v. Goldsmith, Mo.App., 343 S.W.2d 345, 352[4] ; II Wigmore on Evidence, 3d Ed., § 672, pp. 792–795.

 In determining whether there was evidence of a blow to the head accompanied by a period of unconsciousness to support Dr. Mendelson's opinion, rational inferences drawn from testimony, as well as positive testimony, may form the basis of a hypothetical question, Schmitt v. Pierce, Mo., 344 S.W.2d 120, as may facts of which there is substantial circumstantial evidence, Heppner v. Atchison, T. & S. F. Ry. Co., Mo., 297 S.W.2d 497, 506[9, 10] ; and reasonable probability is sufficient to support a hypothetical question on causal connection, Davis v. Brezner, Mo.App., 380 S.W.2d 523, 527[2].

Dr. Mendelson's opinions and appellant's contention stem from this context:

"Q. Assume that Maureen was involved in an automobile collision which occurred in August of 1962, and that as a result of that collision she was thrown out of the car onto the pavement of the street causing a severe, deep laceration on her face and over her eyelid; and assuming further, Doctor, that the first time she fainted and had rigidity of her hands and extremities was in July of 1963, approximately eleven months later; is the difference in time between the collision that is in August and the time of the first faint in July, is that abnormal or unusual in conclusive disorders related to a trauma? A. Oh, not at all. Usually it takes several months to even years for seizures to appear after an episode of brain damage.

"Q. Doctor, assuming that Maureen had a fainting spell and in July of 1963, in which she had jerking or trembling of her extremities; and assuming further that she had another episode in February 1964, where she was hot and was hitting her head on the floor of the bathroom when she was unconscious, assuming also that she complained of dizziness and headaches and grogginess; and further taking into consideration the tests that you have run on her, the EEG test, did you form an opinion based upon a reasonable degree of medical certainty as to the cause of these faints? A. I did. Q. What is your opinion?

"MR. DERRICK: I am going to object to that * * * because I don't think the hypotheses contains all of the facts that should be in. THE COURT: What facts do you want to add, Mr. Derrick? MR. DERRICK: Well I am not going to state at this time what the facts should be. THE COURT: Well, if you feel there are some omitted you may add them. MR. DERRICK: I will do that on cross-examination then. * * *

"Q. * * * what is your opinion, Doctor? A. My opinion was and is that this child had some type of convulsive disorder directly related to the injury experienced * * *."

On cross-examination the doctor was asked:

"Q. Then you took into consideration something else besides what was in that hypothetical question, didn't you? A. I imagine I did, yes. * * * Q. You did take into consideration * * * the history that her mother had given you * * * didn't you? A. Correct. * * * Q. If you had known at the time you made your examination or if it had been included in this hypothetical question that the child's grandmother had had fainting spells and that the father had had fainting spells and that you knew one of her sisters had had fainting spells, would that have made any difference in your diagnosis? A. No. Q. Despite the fact that you just got

**158**

through saying these causes could be hereditary? A. Well, my diagnosis would have been the same. Diagnosis is that of seizures, no matter what the cause is; the diagnosis is one thing that causes the other; do you understand that?

"Q. Yes; my question is as to what the cause of it is. A. You asked me if it would make any difference in my diagnosis. Q. I meant the diagnosis as to the cause, etiology. A. No, no; this—I would have regarded her as having—possibly a low convulsive threshold, but the precipitating event, I still feel, was the injury. Q. That would have to be to the head, would it not? A. Correct. Q. To the brain? A. Yes. Q. That would have to be by some blow to that part of the head, would it not? A. Correct. Q. If there were no blows to the head around the— * * * A. The top. Q. The top and the sides; that is where the blow would have to be? A. Correct.

"Q. If you did have no blow up there, then that would change your opinion as to the etiology of the cause of this; is that correct? A. Decidedly. Q. In your examination were you given any information that she did have a blow on that part of her head? A. I obtained the history that she was unconscious for approximately five minutes. Q. That is not in evidence, and nobody knows whether she was or not, Doctor, so far, so we would have to rule that out. A. Well, one is usually or almost invariably rendered unconscious by a blow to the head. Q. Did you get any history of a blow to the head? A. I concluded she had a blow to the head which rendered her unconscious for five minutes.

"Q. How did you arrive at that conclusion? A. Because when people are struck elsewhere than the head, they aren't rendered unconscious. Q. Then you just assumed that without having any concrete evidence that that occurred, isn't that correct, Doctor? A. Sir, I wrote down the history as I obtained it. * * * Q. Did you say in that report anywhere that she received a

blow to her head? * * * A. She was thrown from a moving automobile and was rendered unconscious for five minutes. Q. Doctor, who told you that she was rendered unconscious? A. Mrs. Conlon."

Appellant made no objection to the hearsay nature of some of this testimony and, at the conclusion of it, moved to strike only "because it has not been connected up with the injury properly here; and furthermore, he based it entirely upon facts not in evidence, the blow to the head and a period of unconsciousness."

■ Application of the principles previously announced and a review of the foregoing testimony and previous statement demonstrate connection between collision and injury and that there was evidence of a blow to plaintiff's head accompanied by a period of unconsciousness. The only thing that plaintiff remembered of the accident circumstances and the first thing she recalled after the accident was sitting in a chair in the nearby filling station where her mother first saw her, permitting an inference that she was unconscious from the moment of striking the pavement until later at the filling station. It is undisputed that a violent collision occurred, the force of which threw plaintiff to the pavement from the car with such an impact as to cause injuries to her head, i. e., the deep cheek and eyelid lacerations. The St. Louis County Hospital record reflects a concern and question of unconsciousness, and plaintiff was examined for head injury when being treated in Barnes emergency for the lacerations. Without objection, Dr. Mendelson testified on cross-examination that plaintiff's mother, Mrs. Conlon, told him that plaintiff was rendered unconscious for approximately five minutes. Dr. Mendelson's diagnosis included cerebral concussion, which means brain injury resulting from a blow to the head, and it was obvious to him and a medical conclusion that plaintiff had sustained a head injury. He was not only told of the head injury and unconsciousness but could see evidence of in-

jury to the head and, even though the lacerations would not have themselves produced unconsciousness, they were evidence from which it could be inferred that the head itself was injured as well. That the evidence of head injury and unconsciousness from Mrs. Conlon was normally subject to objection as hearsay does not deprive it of probative value because "[w]hile * * hearsay, it was not objected to, and in fact was adduced by defendant's counsel. It is the established rule that hearsay evidence, if not objected to, is admissible and may be considered, along with other evidence, in determining whether a submissible case has been made." Hill v. Seaboard Fire & Marine Ins. Co., Mo.App., 374 S.W.2d 606, 609[3]. And see also Corley v. Andrews, Mo.App., 349 S.W.2d 395, 400–401[3, 4], where, as here, a doctor's testimony based on unobjected-to hearsay, sought later to be stricken, was given "its natural probative force"; and Hawkins v. Nixdorff-Krein Mfg. Co., Mo.App., 395 S.W.2d 247, 250[1, 2], where a failure to move to strike hearsay evidence which supported the doctor's opinion was a waiver of objection to the opinion. Likewise, the hospital record mentioning "unconscious" was properly "used to form the basis for expert testimony." Harris v. Goggins, Mo., 374 S.W. 2d 6. Nor was the statement made to Dr. Mendelson impeached by Mrs. Conlon's admission that she did not remember telling any doctor at St. Louis County Hospital that Maureen had been unconscious, because contact with Dr. Mendelson was in his office.

■■ Appellant's contention appears also to attack the sufficiency of *the* hypothetical question, but the record as quoted shows that *two* assumptions of facts and hypothetical questions were put to Doctor Mendelson and, in combination, they include most, if not all, the pertinent facts of the case and are thus sufficient. In any event, "trial courts may exercise a sound discretion over such matters, and the omission of some facts or a violation of the general rules does not necessarily

preclude an answer." Schmitt v. Pierce supra, 344 S.W.2d 1. c. 130[8].

Appellant charges that the $16,000 verdict "is excessive, has no foundation in fact nor evidence to support it, and is the result of bias, passion and prejudice against the defendant since the testimony of Dr. Mendelson failed to connect the alleged brain injury to the injuries sustained in the collision. The only injuries supported by the evidence are the cuts on the cheek and eyelid."

■ The gist of this contention is that Dr. Mendelson's testimony finding brain damage and convulsive seizures and relating them to the collision should have been stricken or withdrawn and that $16,000 is then excessive damages for the remaining injuries physically represented at trial by the two scars. Previous discussion has demonstrated the propriety of overruling the motion to strike Dr. Mendelson's testimony and permitting the evidence of brain damage to go to the jury. With that evidence properly in the case, the contention falls, and it cannot be said that the verdict is so excessive as to be the result of bias, passion and prejudice requiring reversal and retrial.

■ In determining whether a verdict is excessive so as to require remittitur under the theory of uniformity of verdicts, Ficken v. Hopkins, Mo., 389 S.W.2d 193, 202 [17], "[e]ach case must be determined upon its own peculiar state of facts," Emerson v. Mound City, Mo., 26 S.W.2d 766, 767 [3]. Appellant cites some former opinions, "not necessarily for comparing amounts—but to see the manner in which the results were reached," which are distinguishable from this case: Larson v. Atchison, T. & S. F. Ry. Co., 364 Mo. 344, 261 S.W.2d 111, involved nervousness, headaches, and weakened memory. There was no medical expense, a minimum of treatment, and no further treatment indicated. There was no evidence of permanent injury or brain damage. Rosenkoet-

ter v. Fleer, Mo., 155 S.W.2d 157, involved only an extensive laceration on the temple with resultant discoloration and scar. There was no evidence of brain damage. Karnes v. Ace Cab Co., Mo.App., 287 S.W. 2d 378, involved a mild cerebral concussion and headaches. No permanency or brain damage was shown. Gooch v. Lake, Mo., 327 S.W.2d 132, involved severe contusions, fractures, concussions, and unconsciousness, but there was no showing of permanency or brain damage.

■ Without further detailed review, it can be said that the injuries sustained by Maureen Conlon at age 6 are substantial and permanent, and "[p]laintiff's age, and the nature, extent, and permanency of her injuries are paramount factors in determining if her award is excessive." Painter v. Knaus Truck Lines, Inc., Mo., 375 S.W. 2d 19, 26[8, 9]. Here facial lacerations were deep, extensive, painful, and have resulted in scars which are permanent and disfiguring, for which additional plastic surgery requiring hospitalization is recommended. She has suffered brain damage manifested by seizures and is susceptible and has a predisposition to future seizures. Her school work, personality and disposition have suffered and changed. Support for a $16,000 award for such injuries may be found in the cases: Young v. St. Louis Public Service Co., Mo., 326 S.W.2d 107, approved $15,000 damages in 1959 for a 5-year-old girl who sustained head injuries causing permanent impairment of hearing, facial twitching and susceptibility to headaches. Meade v. Kansas City Public Service Co., Mo., 250 S.W.2d 513, affirmed $12,500 damages in 1952 for a 12-year-old girl who suffered permanent brain damage which adversely affected her personality and social aptitudes, a deformity of her nose, instability of a knee, recurrent headaches, and leg and lower-back pains.

■ In these circumstances this verdict is not excessive.

Appellant charges error when the court refused to declare a mistrial "when plaintiff's attorney prejudicially emphasized the matter of insurance in his voir dire examination of the jury panel" by asking two questions about insurance companies interested in the case.

Trial of this case commenced against two defendants, each with an insurance company interested in the defense. Prior to the voir dire and outside the hearing of the jury, plaintiff's attorney requested permission to ask "whether any members of this jury work for, have a financial interest in, or any members of their family have any financial interest in the companies," to be interposed among other questions touching upon the jurors' qualifications. After objections and discussions, the court's position was stated: "He is asking him— you want him to ask one question combined, financial interest in or employment by, of them or their immediate family so that —you want him to ask the question in that way." On the voir dire examination and after some seven questions, counsel proceeded: "Mrs. Roeder is represented here by Mr. Tyree Derrick, the gentleman to my left at the counsel table. He is at 506 Olive Street; he is associated with a man by the name of Karl Holderle. Do any of you folks know either of them, either professionally or socially?

"Do any of you folks work for, or have a financial interest in, or any member of your family work for, or have a financial interest in the American Insurance Group?

"The other defendant was Atlas Electric Company. The latter owned—located in Fort Lauderdale, Florida—I don't know their exact address—but would any of you folks be acquainted with that address at all?

"Incidentally, the driver of that tractor-trailer at the time of this particular occasion has since passed away and before his deposition was taken, and he won't be here at all.

"Now, the Atlas Electric Company is represented by Mr. Paul S. Brown, the gentleman seated behind Mr. Derrick. Mr. Brown is located in the Pierce Building in downtown St. Louis and associates in the firm—I will read off some of the members of that firm—and ask you if you know any of these people—(naming thirteen); do any of you folks know any of the gentlemen I just mentioned, or do you know Mr. Brown either professionally or socially?" Next follows fourteen exchanges between Mr. Padberg and juror Kruetzman. Then: "Do any of you folks work for or have a financial interest in or does any member of your family work for or have a financial interest in the Allstate Insurance Company?"

Appellant then objected and his objection there and argument here is that "the way he handled the insurance question here by asking about those two companies at two different times and then emphasizing unduly the fact there is insurance in the case. That can be only prejudicial to the defendants in this case and I therefore move for a mistrial." Further argument here is that the manner of inquiry was a breach of agreement made in chambers and identified each defendant with an insurance company.

■ The context of the matters in chambers and the pertinent voir dire have been set out because they demonstrate a lack of certainty as to counsel being limited to one question embodying all manner of interest in both companies in a single question. For that reason, the charge of breach of faith is not well taken.

■ Appellant concedes the propriety of examining prospective jurors in respect to their connections with insurance companies interested in the defense of a case, and that "it is within the province of the trial judge to reasonably circumscribe the voir dire inquiry in that respect by limiting the number of questions and imposing other curbs on the nature of the examina-

tion." Gooch v. Avsco, Inc., Mo., 340 S.W. 2d 665, 667 [1, 2].

Appellant attempts to support her argument by Rodenberg v. Nichels, Mo.App., 357 S.W.2d 551, which actually supports respondent because five questions relating to insurance were asked and no reversal was ordered, the court simply observing "that there is surely a limit to the number and extent of these questions. Counsel in their zeal should not entirely forget such limitations." 357 S.W.2d l.c. 555[3, 4]. In Gooch v. Avsco, supra, three questions related to defendant's insurance company, and then a fourth was asked to determine if any members of the panel had ever handled claims or adjusted for any insurance company. No reversal was ordered.

In Martin v. Sloan, Mo., 377 S.W.2d 252, 259[8], counsel assured the court that only one question on insurance would be asked and then asked a second. The court could not say "that absent the agreement that the asking of either or both questions would have been prejudicial. * * * Bad faith is not shown, and whether a mistrial should have been declared * * * rests largely in the discretion of the trial court." See also Bullock v. Sklar, Mo.App., 349 S.W.2d 381, 385[5], 90 A.L.R.2d 318; Bunch v. Crader, Mo.App., 369 S.W.2d 768, 770–771[1–5].

Appellant suggests that this alleged prejudice had a "cumulative effect * * * reflected in the excessive verdict." The verdict already has been shown not to be excessive and no prejudicial connection appears between the voir dire and the verdict.

Finally, appellant charges error in connection with plaintiff's closing argument in that the court permitted counsel "to mention for the first time in the last half of his closing argument to the jury the sum of $25,000.00 as the amount of the verdict the jury should return, and to argue the subject of damages, when he failed to mention anything about the amount of damages in the first half of this argument to

the jury, thus depriving the defendant's attorney of an opportunity to reply to the argument of the amount of damages."

As stated by appellant in her reply brief, the "question (of liability) is not before the court in this appeal," and a very small portion of the jury argument was devoted to liability. The transcript shows that about a page of plaintiff's opening argument was devoted to liability, followed by some six pages of argument on injuries and damages in every detail without mention of a specific figure. Defendant then devoted about a paragraph of argument to liability and some fifteen pages of detailed answer to plaintiff's argument on injuries and damages. Again, there was no mention of a figure. Plaintiff's final argument of some seven pages had these incidents near its close: " * * * You arrive at your verdict, * * *. You are the folks who are going to do it. I have confidence you will do it. I know you will do it fairly. Mr. Derrick never mentioned a figure you should bring in. I think that should be left in your discretion. You can't bring in more than twenty-five thousand.

"MR. DERRICK: I will object to any figures at all; that was not done in the first part of his argument. I want to move for a mistrial in respect to that.

"THE COURT: The jury will disregard any figure. * * * I am going to overrule your motion for mistrial."

Appellant's theory is that this was "unfair, improper and prejudicial" under Shaw v. Terminal Railroad Ass'n of St. Louis, Mo., 344 S.W.2d 32, 93 A.L.R.2d 265. In that case plaintiff never mentioned injuries or damages in his opening statement, defendant advised the court prior to the end of plaintiff's opening argument that plaintiff had not argued injuries and damages and that he would not, therefore, undertake to discuss such items. It was held error to permit plaintiff to argue injuries and damages in closing under those circumstances, because "Counsel having the

affirmative will be held to the requirement of fairly stating his essential points in the opening argument, at least to the extent that the defendant may fairly answer them." 344 S.W.2d l. c. 37[2, 3]. See also Misch v. C. B. Contracting Co., Mo. App., 394 S.W.2d 98, 102, 103; Goldstein v. Fendelman, Mo., 336 S.W.2d 661, 667 [9]. It is doubtful that plaintiff's closing argument here can be construed as suggesting any specific amount which the jury should return. It would be more accurately characterized as advice on the limit of the money damages sought; the jury was not bound by it and could award what "in your discretion" would be a proper amount of damages. See Bertram v. Wunning, Mo.App., 385 S.W.2d 803, 807–808 [7, 8].

Even assuming that the closing argument was a mention for the first time of a specific sum, no prejudice is demonstrated. The jury did not return a verdict for $25,000 but awarded $16,000, a sum already shown not to be excessive, and "[i]n view of the wide discretion afforded the trial judge in ruling both the impropriety and prejudicial effect of argument of counsel, and the deference generally paid to his rulings by the appellate court, Votrain v. Illinois Terminal R. Co., Mo., 268 S.W.2d 838, 844, we would be loath to hold that under the peculiar circumstances here present the court committed prejudicial error." Bertram v. Wunning, supra, 385 S.W.2d l. c. 808. In Sullivan v. Hanley, Mo.App., 347 S.W.2d 710, plaintiff's opening argument was on liability without mention of injuries or of an amount of money. Defendant answered the liability argument and referred briefly to the matter of injuries. Plaintiff closed with reference to liability, injuries, and a mention that "there's not a man or lady on this jury which would take fifteen thousand,"—Objection—"Objection sustained." That case also was unlike Shaw v. Terminal Railroad Ass'n, supra, because defendant's counsel argued injuries and it was, as here, properly within the court's

discretion to permit closing argument on damages and injuries where the court sustained the objection to the figure and instructed the jury to disregard it. 347 S.W. 2d l. c. 716[6].

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HENLEY, P. J., and SEILER and HOLMAN, JJ., concur.

STORCKMAN, J., not sitting when cause was submitted.